**GNB BATTERY TECHNOLOGIES, INC., Plaintiff,**

v.

**EXIDE CORPORATION and General Battery Corporation, Defendants.**

Civ. A. No. 88–407–RRM.

United States District Court, D. Delaware.

Feb. 10, 1995.

Robert H. Richards, III, Richards, Layton & Finger, Wilmington, DE, Gordon R. Coons, Charles H. Mottier, Pamela J. Ruschau, Leydig, Voit & Mayer, Chicago, IL, for plaintiff.

Paul E. Crawford, James D. Heisman, Connolly, Bove, Lodge & Hutz, Wilmington, DE, Frank J. Benasutti, Benasutti, P.C., Wynnewood, PA, for defendants.

## OPINION

McKELVIE, District Judge.

This is a patent case. GNB Battery Technologies, Inc. ("GNB") is the owner of U.S. Patents 4,645,725 ("the '725 patent") and 4,701,386 ("the '386 patent"), which cover specific configurations of dual-terminal batteries. On July 18, 1988, GNB filed suit against the defendants claiming infringement of both the '386 and '725 patents. Defendants denied infringement and alleged that both patents were invalid.

The parties stipulated to trying the liability and damage issues separately. The issues of infringement and validity were tried to a jury over a period of six days in November of 1993. On November 30, 1993, the jury returned a verdict in favor of GNB on the issue of infringement of certain claims of the '386 and '725 patents. The jury also found in favor of GNB on defendants' claim that

the '386 patent was invalid. However, the jury was unable to reach a unanimous verdict on the proof of invalidity of the claims of the '725 patent. On December 22, 1993, the court declared a mistrial with respect to the '725 patent.

Defendants have filed a motion for judgment as a matter of law, or alternatively, for a new trial on the issue of the validity of the '386 patent. This is the court's decision on that motion. This Opinion will first set forth the evidence offered by both parties in support of their respective positions during the course of trial. It will also discuss the significant procedural events which occurred at trial. Unless otherwise noted, the facts cited in this Opinion are taken from testimony or documents offered during the course of trial. The Opinion will then analyze the defendants' arguments regarding judgment as a matter of law and the plaintiff's contention that substantial evidence supports the jury's verdict.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The technology at issue in this case relates to automotive replacement batteries such as the battery one would purchase in a K–Mart retail store to replace a worn-out battery in one's car. A replacement battery must meet certain size requirements of particular automobiles and provide sufficient power, or cold cranking amps, to start the car and power the lights and appliances. Such batteries are called starting, lighting and ignition ("SLI") batteries in the trade.

### A. Problems Faced in the Industry and Solutions

Originally, batteries had terminals that protruded through the cover on top and towards the front of the battery to which the battery cables from the car were connected. As automobile manufacturers became concerned with the weight of cars they began to limit the length of cable used to connect to the battery terminals. In addition, smaller cars required smaller batteries to fit under the hood. This posed a problem because some cars required the positive terminal on the right while others required the positive terminal on the left. As a result, battery manufacturers had to produce and retailers had to sell both right- and left-handed batteries for the different size and power requirements of various cars. This increasing number of batteries also posed a problem for retailers because the average shelf-life of an SLI battery is 30 to 60 days.

In response, battery makers devised top terminal batteries with the terminals on the centerline of the cover. Thus, the same battery could be used both for right- and left-handed applications simply by turning it 180 degrees.

In the 1970s General Motors began requiring batteries in its cars where the terminal connections to the battery were on the side of the battery as opposed to on the top. This added yet another category of batteries to those replacement battery manufacturers were required to produce and retailers were required to stock.

By the early 1980s the battery industry had become extremely competitive. Retailers had to carry 50 to 60 different sized batteries to fit the different sized cars, and these batteries had varying power and quality levels. Consequently, a retailer had to carry on the order of 200 different types of batteries. This posed an inventory problem for the retailer and a manufacturing problem for the producer.

The major battery manufacturers sought ways to solve this problem. One solution was a short-line, which is a reduced number of batteries designed to fit a broad number of applications. For example, battery makers would add a piece of plastic to the base of the battery container of smaller sized batteries which would allow them to fit into cars normally requiring larger sized batteries. At this time, Johnson Controls ("JCI") developed a short-line of three batteries which were sold under the Die Hard Incredicell trademark by Sears. One of the batteries, called the "pig tail" battery in the trade, had wires coming out of the side of the battery. It could be installed in a car requiring either top or side terminals by cutting the connections and splicing the two wires together. Consumers encountered problems in fitting

the pig tail Incredicell in their cars and in making the required connections.

Another solution was to provide a dual-terminal battery with both side and top terminals so that it could be used either in a GM configuration or a standard configuration. One such dual-terminal battery was the Torque Starter made and sold by Chloride Group PLC, and later by GNB after it acquired Chloride.

The parties disputed the success of the Torque Starter battery as a solution to the mounting inventory and manufacturing problems. Defendants offered the testimony of Dr. Lesley E. Holden formerly of Chloride Group on the success of the Torque Starter. Holden testified that the Torque Starter battery fit a large number of applications and that many were sold.

GNB, however, called Thomas O. Minner, Vice President and General Manager of the Automotive Battery Division at GNB, who testified that problems quickly developed with the battery. For example, the battery had difficulty fitting into cars in which it was designed to fit and many batteries were returned. GNB also offered the deposition testimony of E.R. Musgrove, product engineering manager for Exide during the relevant period. He testified that the Torque Starter had a number quality control problems. For example, batteries would not last as long as they were designed to last. Other batteries would explode under the hoods of cars. According to Musgrove, when Exide was developing a dual-terminal battery, it rejected the Torque Starter approach because the internal connections to the bushings require a number of manufacturing operations including the connections of the top and side terminal and the assembly of different parts to be molded into the cover. GNB also offered testimony from Thomas Pfost of General Battery who stated that in his opinion the Torque Starter was useful only as a "boat anchor."

After GNB assumed control over the Chloride battery group, it decided to cease production of the Torque Starter because of quality concerns highlighted by the number of batteries returned due to defects. GNB, however, continued to supply the Torque Starter to some existing customers.

In addition to problems with increasing numbers of batteries, a common problem encountered throughout the battery industry with lead-acid batteries has been electrolyte and gas leakage. The typical automotive battery is comprised of a plastic container and cover, which encase the electrochemical heart of the battery—the acid and plates that generate the electrical energy. Electrical power travels from the heart of the battery through a post, which is connected to a bushing, molded in some way into the cover. It then passes from the bushing to the terminals, where the connection is made to the automobile.

Leaks occur along the seal between the bushing and the cover and hamper the electrical performance of the battery by adding resistance at the terminal connections. Several factors such as the seal construction, over-tightening (or over-torquing) of terminal connections and vibration during use can cause leaks to develop.

Faced with these problems, the major battery makers began to investigate ways to solve the problems of the ever-increasing numbers of stock keeping units ("SKUs") for replacement batteries and of the structural integrity and leakage around the bushings.

B. *Development of GNB's Invention*

In early 1984, GNB began developing a new dual-terminal battery that would reduce the number of SKUs and provide a structurally stable, leakproof battery. Joseph J. Jergl, Vice President of Engineering, and William H. Kump, Manager of Product Engineering, undertook the design of a dual terminal battery for GNB. For a year, Kump and Jergl worked on designs to create a single connection from the electrochemical heart of the battery to a terminal bushing which would then branch out and provide a top and side terminal configuration in which the bushing was almost completely embedded in the cover material of the battery so that it provided a sturdy leakproof seal. They worked through a dozen concepts before settling on their final design, which became the Champion dual-terminal battery.

Jergl testified that GNB sought to accomplish a number of objectives with the Champion battery. First, it sought to reduce the number of batteries retailers would be required to stock and producers would be required to make. Second, it wanted to provide a maintenance-free battery with dual terminals which would appeal to customers. Finally, GNB wanted a reliable battery that could be produced economically.

Kump and Jergl focused on three areas to achieve the desired reliability. First, they wanted to reduce the number of lead connections. Second, they sought to prevent acid leakage along the bushings. Third, they wanted to anchor the terminal connections in such a way that they would be resistant to over-torquing. To produce the battery at the lowest cost, they sought to minimize the number of manufacturing operations required to make the battery.

Their first design had a top terminal and a conventional side terminal in the container of the battery, as opposed to in the cover. It also had two lead to lead connections per pair of terminals. This design was rejected in part because it failed to satisfy the reliability requirements. Kump and Jergl were concerned that leakage would be more probable where the side terminal was placed below the acid level.

Kump and Jergl shifted their focus to a single two-terminal bushing that would have only one lead to lead connection or "burn." Ultimately, they settled on one- and two-armed bushings embedded in the cover of the battery. Embedment of the terminal bushings in the cover achieved the goal of maximizing the resistance to acid leakage. In addition, these designs resulted in no loss of cold cranking capability and the cross-sectional areas of the arms were such that the same power rating would appear at both the top and side terminals. Furthermore, because they required only one lead to lead connection per pair of terminals these designs minimized manufacturing costs.

Finally, Jergl testified that the Champion met their goal of reducing SKU's by filling 95% of the existing applications. The use of a spacer allowed the battery to fit into a large number of automobiles. At the same time, their bushing design made the Champion capable of providing the same number of cold cranking amps and amount of reserve capacity as the largest batteries offered on the market.

## C. The '725 and '386 Patents

GNB filed a patent application for the Kump and Jergl invention in the United States Patent and Trademark Office ("PTO") on August 30, 1985. During the course of the prosecution of this application in the PTO, the patent examiner found that the application disclosed two inventions and required GNB to pursue them separately. GNB chose to prosecute the application for a dual-terminal battery with a one-armed bushing first. This application matured as United States Patent 4,645,725 ("the '725 patent"), which was issued on February 24, 1987, and assigned to GNB.

On that same day GNB filed a patent application for the second invention. The application matured as United States Patent 4,701,386 ("the '386 patent"), which was issued on October 20, 1987, and is a division of the '725 patent. Kump and Jergl assigned the '386 patent to GNB. This patent describes a dual-terminal battery with a two-armed bushing in its claims.

The background of the invention submitted with the application described the problem faced by battery manufactures as follows:

> [D]ual terminal batteries having centered top terminals are preferred over conventional side and top terminal batteries because such dual terminal batteries can be mounted in a wider variety of vehicles. Unfortunately, despite the clear need for a reliable dual terminal battery and primarily due to the design of their bushings, such batteries do not appear to have achieved a high degree of success in eliminating electrolyte and gas leakage. Moreover, the seal between the bushing and plastic and between the bushing and element post and the bushing itself has tended to deteriorate and/or break during service. Additionally, dual terminal designs should provide equal electrical conduction to both sets of terminals, however, because of cover design lim-

itations, they are difficult to make and assemble. Side terminals of some dual terminal batteries also are inaccessible and make it difficult to connect the battery to side terminal connectors.

The specification goes on to explain that it is an object of the invention to address each of the problems faced in the industry.

The '386 patent contains twelve claims. Claim 1 is an independent claim and claims 2 through 12 depend on claim 1. GNB requested the jury only to determine infringement of claims 1 through 10. Claim 1 reads as follows:

1. A dual terminal, electric storage battery comprising:

(a) a container;

(b) a cover;

(c) a single pair of element posts in electrical communication with electrochemical components;

(d) a single pair of terminal bushings, substantially completely embedded in said cover, each of said bushings being electrically connected to one of said element posts and comprising,

(i) a body portion,

(ii) a side terminal end, which side terminal end is mounted through an opening in an angled surface of said cover, which angled surface is at an angle acute to the plane generally contiguous to the top surface of said cover,

(iii) a top terminal end, which top terminal end is mounted through an opening in said top surface of said cover on or in the vicinity of its longitudinal center line,

(iv) an element post end,

(v) a first connecting arm extending sideways from said body portion to said side terminal end,

(vi) a second connecting arm extending sideways from said body portion to said top terminal end, wherein said body portion and said element post end define a hole passing axially therethrough and adapted to receive therein one of said element posts;

(e) a pair of side terminals in electrical communication with said side terminal ends of said bushings; and

(f) a pair of top terminals in electrical communication with said top terminal ends of said bushings.

Claims 2 through 10 read as follows:

2. The battery of claim 1, wherein said first and said second connecting arms have approximately equal transverse cross-sectional areas and lengths.

3. The battery of claim 1, wherein said side terminals are threaded, steel nuts embedded in said side terminal ends of said bushings.

4. The battery of claim 2, wherein said side terminals are threaded, steel nuts embedded in said side terminal ends of said bushings.

5. The battery of claim 1, wherein said bushing is provided with one or more ribs disposed along the surfaces of said bushing.

6. The battery of claim 4, wherein said bushing is provided with one or more ribs disposed along the surfaces of said bushing.

7. The battery of claim 1, wherein said battery is a wet, dual terminal, electric storage battery.

8. The battery of claim 6, wherein said battery is a wet, dual terminal, electric storage battery.

9. The battery of claim 2, wherein said bushing is provided with one or more ribs disposed along the surfaces of said bushing.

10. The battery of claim 3, wherein said bushing is provided with one or more ribs disposed along the surfaces of said bushing.

The '386 patent includes seven figures. Figure 7 depicts the two-armed bushing that is described in the claims of the '386 patent. All the figures are identical to those of the '725 patent. The specification of the '386 patent is virtually identical to that of the '725 patent. The patent provides a description of Figure 7 as follows:

the bushing 140 comprises a body portion 147, a side terminal end 141, a top terminal

end 142, and element post end 143, connecting arms 148 and 149 extending from the body portion 147 to respectively the side terminal end 141 and top terminal end 142, and a generally cylindrical hole 145 passing axially through the body portion 147 and element post end 143 and adapted to receive an element post.

Fig. 7.

In addition, the Detailed Description of the Invention contains the following:

It should be noted that, in contrast to those of bushing 40, the top terminal ends 142 of bushings 140 are the top terminals and are not fused to the element posts to form the top terminals. In other particulars, however, the bushing 140 is made and used in substantially the same manner as shown and described herein in reference to bushing 40.

GNB commercialized the one-arm bushing of the '725 patent as the Champion dual-terminal battery and introduced the Champion battery at the 1985 Automotive Parts and Accessories Show ("APAA").

Minner testified that when GNB introduced the Champion battery Wal–Mart retail stores, which had not been selling a dual-terminal battery, test marketed the Champion in the Southern market. Wal–Mart found that it could sell this battery at a premium price and stock less inventory. Initially, Wal–Mart split the GNB and JCI business by region. However, Wal–Mart ultimately sold the Champion battery nationwide.

Minner explained that when the Champion battery was introduced it was directed at group sizes 26, 26R, and 70. The group size designation identifies the length, width, height, and the location of the positive and negative terminals. In 1987, GNB introduced a Champion dual-terminal battery directed at group size 3478.

### D. General Battery's Development of Its Dual–Terminal Battery

GNB offered the deposition testimony of Rex Luzader, current Vice President of Engineering at Exide and former Vice President of Engineering at General, on General Battery's development of its dual-terminal battery. Luzader testified that General started a universal terminal project in the latter part of 1985. General had been investigating terminal configurations to eliminate problems with leaking side terminals since 1983. After GNB introduced its dual-terminal battery at the 1985 APAA, General Battery employees met to discuss a response to that offering. Luzader testified that he believed General's decision to commercialize a universal terminal battery came after that meeting.

By late 1985, General had produced a mock-up of the GNB cover design depicting the top and side terminal arrangement. Luzader believed that the mock-up was created from a sample GNB battery obtained by its marketing department. Luzader also stated that General knew that the side terminal

angle for its commercial product would be the same as the angle on the GNB battery. Luzader also explained that he felt General could commercialize their proposed design because counsel had advised them that no patent could issue on the GNB battery. However, Luzader also acknowledged that General had sought patent protection for its dual-terminal battery design.

GNB also offered the deposition testimony of Thomas Pfost on General's development of its universal terminal battery. Pfost was a product analyst with General at the time General developed its dual-terminal battery. Pfost testified that in 1985 General was considering three designs for a universal terminal battery. One design had off-center top terminals with a side terminal "looped" over the side of the battery. Another design was a combination of the standard top and side terminal battery with the electrical connections made inside the battery. The third design was the slanted side terminal that became General's product.

General created some models for marketing purposes. Pfost explained that they placed covers from GNB's Champion battery on their battery containers for purposes of a consumer survey. In addition, Pfost testified that he had a discussion with Luzader about the angle on the side terminal. Luzader had been concerned about the angle of the side terminal and potential problems with it properly fitting in GM cars. Pfost told Luzader that he felt the angle used by GNB would be sufficient "because of their research." He knew GNB had a good reputation for research and that based on that belief if GNB had come up with that angle no retrofit problems would follow.

GNB then offered the deposition testimony of Carl J. Anderson, who was involved in the development of General's universal terminal battery. Anderson testified that General assembled a project team at the request of Luzader in August of 1985 to come up with a cost-effective dual-terminal battery with the least amount of expenditures. Initially, six designs were considered, but none were reduced to formal drawings. A seventh design ultimately became the commercial product.

Anderson stated that at no time during the development did General have copies of drawings of the GNB battery. Anderson, however, testified about a note which said "copy GNB APB" that appeared on one of the drawings of potential designs which was shown to upper management. He assumed it meant they should look at GNB's battery and see if there was anything that they should use in their design. Anderson indicated General wanted to remain competitive and that it wanted to be in the market with a dual-terminal battery as soon as its competitors were.

GNB also offered the deposition testimony of David Beidler, one of the developers of General's dual-terminal battery. He explained that General had access to covers from GNB's Champion battery during the course of the development of its product.

### E.  *GNB's Case on Infringement of the '386 Patent*

During its case on the issue of infringement, GNB offered evidence to show defendants' two-armed, dual-terminal battery infringed claims 1–10 of the '386 patent. For example, GNB called John Devitt as a technical expert in lead batteries to testify on the issue of infringement. Devitt holds a B.S. and M.S. in Electrical Engineering from the University of Colorado and has worked in the battery field for over 40 years. Devitt testified that he reviewed the claims of the '386 patent and compared them with defendants' two-armed, dual-terminal battery. Devitt then offered his opinion that defendants' two-armed dual-terminal battery infringes claims 1–10 of the '386 patent. Defendants called no witnesses to testify on the infringement issues.

### F.  *Defendants' Case on Definiteness and Enablement*

During the course of trial, defendants attempted to prove that the claims of the '386 patent were invalid for failure to comply with the enablement and definiteness requirements of 35 U.S.C. § 112. That proof mainly took the form of cross-examination and attorney argument. In particular, defendants challenged GNB's witnesses on the issue of

whether one skilled in the art would understand how to substantially completely embed the bushing in the cover of the battery as claimed in the '386 patent given that Figure 7 in the '386 patent does not depict embedment. For example, defendants questioned Jergl during cross-examination as to whether Figure 7 in the '386 patent, depicting the two-armed bushing, shows how that bushing is embedded. Jergl responded that Figure 7 shows only the bushing and not how it is embedded in the cover of the battery.

On redirect, GNB had Jergl quote from the specification of the '386 patent that the bushing depicted in Figure 7 is "made and used in substantially the same manner as shown and described herein in reference to bushing 40." He was then asked "As a battery designer, do you understand what that means?" Jergl responded, "I believe that it means that if you look at both configurations, you look at the one-arm bushing, that really teaches you the details of the design."

GNB also called its expert witness John Devitt to testify on these issues. Devitt testified that the specification of the '386 patent was clear concerning embedment. He stated that the specification and drawings provide a detailed explanation of what is meant by a bushing substantially completely embedded in the cover.

Finally, GNB offered deposition testimony of two Exide employees on these issues. E.R. Musgrove, manager of product engineering from 1981 through 1986 for Exide, responded that he had read the patent and that there was nothing about the patent that he did not understand. Rex Luzader, Vice President of Engineering for both General Battery and then Exide, responded that from a technical standpoint he understood what was being disclosed and claimed.

G. *Defendants' Claim of Obviousness*

Defendants principle contention at trial was that the claims of the '386 patent were invalid for obviousness, and during the course of trial, defendants offered evidence to support their position. That evidence included a number of prior art references that described and depicted batteries and battery terminals, as well as a number of actual batteries commercially available during the relevant period. In addition, defendants offered prior statements by the inventors of the '386 patent. The defendants also offered expert testimony and testimony from an inventor of one of the principle prior art references to explain to the jury the significance of the prior art, as well as the differences between the prior art and the claims of the '386 patent.

One of the prior art references is U.S. Patent 4,424,264, titled "Multicell Electric Storage Batteries," which was issued to McGuire and Tatlock and was assigned to Chloride Group PLC ("the McGuire patent"). In addition, defendants offered into evidence a battery called the Torque Starter, which was made and sold pursuant to the McGuire patent.

A second principle prior art reference is U.S. Patent 4,444,853 titled "Storage Battery Construction" which issued to Halsall and Hennen and was assigned to Globe–Union Inc. ("the Halsall patent"). Three batteries were made pursuant to this patent and sold under the Die Hard Incredicell trademark. One design had wires emanating from the side of the battery which were then spliced to the wires in the car. Another battery had an angled side terminal. A third had a centered top terminal. Defendants offered the latter two batteries into evidence.

A third prior art reference is Japanese Laid–Open Publication 56–175964. This reference depicted and described a battery with a screw side terminal and top terminal. Defendants also offered into evidence U.S. Patent 4,371,591 issued to Oxenreider, U.S. Patent 2,052,499 issued to Strough, a portion of a book titled "Vinyl on Storage Batteries," and U.S. Patent 2,242,599 issued to Raney.

In addition, defendants offered statements from a brief and an affidavit signed by Kump which was filed during the course of a prior litigation in this court involving the McGuire patent. In 1987, the Chloride Group PLC, makers of the Torque Starter Battery and owners of the McGuire patent, sued GNB for infringement of the McGuire patent in selling the Champion battery. During the course of that litigation GNB filed a motion for a sum-

mary judgment arguing that the McGuire patent was invalid for obviousness. GNB supported its motion with an affidavit from Kump. The case, however, settled before any decision was rendered on this motion.

In an affidavit dated March 2, 1988, and submitted in support of the motion for a summary judgment, Kump, one of the inventors of the '386 patent, made statements about certain patents and the desirability of combining those patents. For example, Kump stated

In my opinion, locating the top terminals of the Japanese Laid Open Publication on the centerline of the lid of the battery, as called for in the claims of the [McGuire] patent, would have been an obvious modification, even to a lay person, particularly in view of the advantages already well known in the art and acknowledged in the specification of the [McGuire] patent to arise from the placement of the top terminals on the centerline of the lid of the battery container. . . .

Stated differently, it would have been obvious, even to a lay person, at the time of the alleged invention of the [McGuire] patent, to design the battery shown in the Japanese Laid Open Publication with the top terminals either off the centerline of the lid, as shown, or on the centerline if the known benefits of "evenhandedness" were desired. These are the only two options, and the particular option selected would merely have been a matter of choice.

He then stated

It would be a commonsense approach, even to a lay person, to a simple design problem to consider what had been done in the art, and simply to incorporate or combine the structure of side terminals such as those shown in Rorer patent when designing side terminals for a dual terminal storage battery such as that disclosed in the Japanese Laid Open Publication.

Finally, Kump described the Japanese Laid Open Publication as follows:

[The Japanese Publication] shows, in Figure 2, a storage battery having dual terminals, i.e., a pair of terminals on both the top and side wall of the lid of the battery container. . . .

. . . .

In addition to the disclosure of Figure 2, the Japanese . . . Publication, in Figure 1, shows a portion of a battery container, a lid, and a terminal pillar extending from a plate group. A bushing is embedded in the lid and supports a terminal on the top part of the terminal pillar. A horizontal member . . . extends from the bushing and is exposed on the outside wall of the lid. A screw-type terminal is threaded into a bore in horizontal member 7.

In addition, defendants offered into evidence statements made by Kump and Jergl in depositions taken during the course of this litigation. For example, Jergl stated during depositions in this case that the Halsall patent discloses a battery with side terminals on an angle substantially completely embedded as that phrase is used in the patent. Kump agreed that the Japanese Publication shows a dual-terminal battery with a top post and side terminal mounted in the cover. He responded that it was substantially completely embedded but that it would not provide the same strength benefits of the GNB design.

Defendants offered deposition testimony of Vincent M. Halsall about his patent and the Die Hard Incredicell batteries made pursuant to that patent. Halsall is the Vice President and General Manager of Advanced Battery Business Unit of Johnson Controls (JCI). He first identified the top and angled side terminal batteries made in accordance with his patent. He then testified about his patent as follows:

Question: In accordance with your invention, as disclosed, is it possible to produce a dual-terminal cover? In other words was it possible to have both the embodiment shown in [Figure 10] combined with the embodiment shown in [Figure 12]?

. . . .

Answer: Okay. The design shown in Figure 12 and Figure 10 fitted the manner in which we specifically wanted to use the tool at this time, which was late 1983. Our ability to design the two castings that we used in Figure 10 and Figure 12 were such

that, clearly, you could virtually overlay the bushing portion of the drawing shown in Figure 10 and Figure 12.

And were you to do that, you would end up with an identically assembled battery, which could have four terminals put on it.

Defendants called Clifford Knowles as an expert in the field of lead batteries to testify on the obviousness issue. Knowles, educated in England, is a Chartered Chemist and a Fellow of the Royal Society of Chemistry. Knowles first offered his opinion on what the Torque Starter dual-terminal battery and the Japanese Publication disclose. Knowles stated that the Torque Starter is a dual-terminal battery with a top terminal on the centerline and a side terminal molded into the lid portion and designed to fit a GM cable. He explained that the Torque Starter has a bushing for the top terminal and a bushing for the side terminal and two element posts connecting to those bushings. He further stated that the side terminal is embedded in the cover. Referring to the Japanese Publication, Knowles testified that it shows a dual-terminal battery with a single bushing substantially completely embedded in the lid with ribs. He explained that the top terminal is not on the centerline as it is with the Torque Starter battery.

Next, Knowles testified about Kump's statement in his affidavit on the obviousness of substituting known side terminals on a dual-terminal battery. Knowles agreed with Kump's statement in his affidavit that it would have been obvious to locate the top terminals shown in the Japanese Publication on the centerline. He also agreed with Kump's statement that it would be a common sense approach to a simple design problem to substitute a known side terminal for the side terminal shown in the Japanese Publication. For example, one could substitute the angled side terminal shown in Figure 10 of the Halsall patent for the screw-type side terminal shown in the Japanese Publication. In Knowles' opinion, these two statements by Kump demonstrate the obviousness of the claims of the '386 patent.

Knowles then turned to the batteries made in accordance with the Halsall patent. He testified that the side terminal battery repre-

sented by Figure 10 in the Halsall patent has an angled side terminal with a single bushing to connect to the element post where the bushing is substantially completely embedded in the cover. Using a cutaway portion of the angled side terminal of one of the batteries, he explained that plastic surrounded the lead bushing with ribs on all surfaces except where a connection has to be made. Knowles then explained that the top terminal battery represented by Figure 12 of the Halsall patent has top terminals on the centerline with the bushing "encapsulated in the plastic of the lid." He then offered a drawing which overlaid Figures 10 and 12 from the Halsall patent.

Knowles offered his opinion that Figures 10 and 12 from the Halsall patent when combined depict the bushing claimed in the '386 patent. He responded that the teachings and suggestions in the prior art lead to the combination of Figures 10 and 12. For example, he testified that McGuire teaches a dual-terminal battery with a terminal on the centerline and a side terminal both with bushings embedded in the lid. Further, it has equal arms extending to the top and side terminals which would result in equal performance of both the top and side terminals. According to Knowles, the dual-terminal battery taught by McGuire provides the teaching to combine Figures 10 and 12 from Halsall which together satisfy all of the elements of the claims of the '386 patent.

Knowles concluded that from a technical standpoint the claimed invention of the '386 patent would have been obvious to one of ordinary skill in the art at the time of the invention.

In response, GNB offered evidence to show that the invention as a whole would not have obvious to one skilled in the art at the time of the invention in the light of the prior art. For example, plaintiff tested the opinions offered by defendants' expert witness Clifford Knowles during cross-examination. Knowles was questioned about the Halsall patent. He agreed that Halsall described and depicted three different batteries that collectively were trying to solve the industry problems of staggering inventory and manufacturing as explained in the specification of

that patent. He also agreed that no figure in the Halsall patent showed the combination of Figures 10 and 12 and that no one had combined them before Kump and Jergl had in the '386 patent.

Plaintiff then called its expert witness John Devitt to testify on issues relevant to obviousness. First, Devitt testified about the Japanese Publication. He explained that it depicts and describes a battery with both top and side terminals where the screw-type side terminal supplies electrical power to appliances at the same time the top terminals provide starting power. The connection to the side terminal is about one-third the size of the connection to the top terminal and thus the amount of electrical current to the side terminal would be limited. He testified that the battery depicted and described in the Japanese Publication was not directed toward providing a battery that could be used both in a GM car and in a car requiring standard top terminals. He further testified that the way the publication depicts the connection between the top terminal and the bushing the battery would not provide mechanical strength to resist torque.

Devitt then testified about the McGuire patent and the Torque Starter produced in accordance with that patent. He explained that the Torque Starter has two centered top terminals and two vertical side terminals. Each set of terminals is connected to a separate post which then connects to the strap in the heart of the battery. The battery has four acid seals, two for the top terminals and two for the side terminals. Furthermore, the battery requires four welds, two for the top terminals and two for the side terminals. He testified that about 30% of the vertical height of the battery is taken up by the terminal structure in the cover which makes providing a small, powerful battery that can fit in a number of cars difficult.

GNB also called Devitt to explain the significance of statements made in the prior litigation involving the McGuire patent. Devitt explained that claims of the McGuire patent do not describe the structure of the connection between the top and side terminals. Instead those claims focus on a battery with a centered top terminal and side termi-

nal. He saw very little connection between the McGuire patent and the '386 patent. He further testified that the Kump affidavit had little connection with this case because the Kump affidavit was directed at the claims of the McGuire patent, whereas the '386 patent claims a different structure, which is a one-piece bushing embedded in the cover of the battery.

On the Halsall patent, Devitt explained that it proposed three batteries to solve the problems of increased inventory. Each battery required an inner and outer cover and would not work without both covers. With respect to the top terminal battery depicted in Figure 12 of the Halsall patent, Devitt testified that it would not have provided a leakproof, structurally stable seal because the bushing was not substantially completely embedded in the cover. In fact, Devitt stated he had seen leaks in both a top terminal and side terminal battery made in accordance with the Halsall patent.

Devitt also testified as to whether the prior patents and publication offered by the defendants would provide the teaching, suggestion, or motivation to combine the various elements to arrive at the claimed invention of the '386 patent. He offered his opinion that the Halsall patent does not suggest nor teach the combination of the side terminal battery and the top terminal battery. In addition, he stated that "there is no teaching and no background information, prior art, the things we have been talking about here, that actually points in the direction they want." He offered his opinion that one skilled in the art at the time of the invention would not look at McGuire, which has most of the dual-terminal parts down inside the battery and has two terminal posts and bushings, and disregard the teaching of Halsall of three batteries with three separate terminal structures to solve the inventory problem. In his opinion, neither the McGuire patent nor the Torque Starter battery made in accordance with that patent teach or suggest the combination of the side and top terminal Die Hard Incredicell batteries depicted and claimed in the Halsall patent.

GNB also offered the prosecution history of a patent filed by defendants covering simi-

595

lar technology. GNB called Devitt to testify about that patent and statements made during the course of the prosecution of that patent. General Battery filed a patent application for an invention by Carl J. Anderson, Scott J. Conrath and David B. Beidler in the PTO on April 2, 1987. Claim 1 in the application originally read:

1. A storage battery, comprising:

(a) a battery container for housing the elements of said storage battery;

(b) a one piece cover attachable to said battery container, said cover having sloping portions adjacent said cover longitudinal edge;

(c) a first pair of battery terminals located along a longitudinal centerline of said cover;

(d) a second pair of battery terminals located on the sloping portions of said cover; and

(e) connection means for establishing electrical contact between said first and said second battery terminal pairs and said battery plates.

This application ultimately matured as United States Patent 4,752,543 (the "Anderson patent").

In an Office Action, the examiner rejected this claim stating that it was "clearly" anticipated by the '725 patent. In addition, during the prosecution of this patent General Battery filed an Information Disclosure Statement which stated that Halsall did not teach "a single cover that can accept both cable pressure clamps and cable ends for side mount terminals." After indicating that the most pertinent prior art included the Halsall patent and the Oxenreider patent, General Battery stated that "the art contains no teaching that these references could or should be combined."

Devitt testified that the Anderson patent was directed at the very same invention as the '386 patent. He offered his opinion that

the fact that none of these references suggest or disclose the use of integrally formed conductive metal electric adapters extending between and forming a battery post and a battery terminal in a storage battery, and that's a description of both

... Figure 3 [of the Anderson patent] and ... Figure 7, [of the] '386 [patent], demonstrates that the [claims of the '386 patent were] not obvious to a person of ordinary skill in the art at the time of the present invention.

He concluded, therefore, that the patents discussed at trial do not suggest or teach the invention of the '386 patent and it would not have been obvious to one of ordinary skill in the art at the time of the invention. This conclusion, he explained, is based on his experience, the patents having been issued, the prior art, and is supported by the statements made by General Battery during the prosecution of the Anderson patent.

On level of skill in the art, Devitt offered his opinion that one skilled in the art would be "a person who has a few years hands-on experience, working in the battery field and design and manufacturing, a person who does not necessarily have a college degree, but a person who has worked in the field for a while."

GNB called Rene Tegtmeyer to testify on PTO procedures and practices and in particular to testify about the prosecution history of the '725 and '386 patents. Tegtmeyer is a partner with the law firm of Fish & Richardson and a former Assistant Commissioner for Patents at the PTO. He testified that references to the Halsall patent, and specifically to Figures 10 and 12, appeared in the prosecution history of the '725 patent to which the '386 patent depends and in the prosecution history of the '386 patent. He further testified that references to the McGuire patent and the Japanese Laid Open Publication were made to the examiner during the prosecution of the '725 and '386 patents.

Finally, GNB called their inventors to testify and explain their deposition testimony. For example, Jergl testified that what he meant by his statement in his deposition regarding the Halsall patent was that "the bushing was physically embedded in the cover to the extent that it can be practically done." He noted, however, that batteries made in accordance with that patent leaked and were taken off the market by JCI.

Kump testified about his affidavit attached to the brief filed in the litigation involving the McGuire patent. In preparing his affidavit, Kump was provided with the Japanese Publication, the Oxenreider patent, and a patent issued to Rorer, and was told that the examiner did not consider any of these patents in the prosecution of the McGuire patent. In addition, he was told that the examiner granted the patent to McGuire because the patent claimed a top and side terminal in the cover. In Kump's opinion this distinction was "very much like the Japanese Publication, which also [showed] the side terminal in the cover and a top terminal."

## H. *The Jury Verdict and Mistrial*

The court invited the parties to submit a joint set of written interrogatories to the jury. The parties, however, were unable to come to an agreement on a single list of questions for the jury to answer. The court then decided to submit a set of interrogatories from each party to the jury and allow counsel to advocate to the jury how it should answer their respective questions.

In addition to separate sets of written interrogatories, the court submitted a verdict sheet to the jury. On November 23, 1993, the court charged the jury, the parties delivered closing arguments and the jury began deliberations. On November 29, 1993, the jury reported that they were unable to reach agreement on the validity of the claims of the '725 patent and on certain of defendants' interrogatories. After conferring with counsel, the court then accepted the jury's verdict.

On the verdict form, the jury reported that GNB had proven by a preponderance of the evidence that defendants infringed claims 1 through 10 of the '386 patent and claims 1–9, 12, and 13 of the '725 patent. The jury also reported that defendants had not proven by clear and convincing evidence that claims 1–10 of the '386 patent are invalid. However, the jury was unable to reach a unanimous verdict on the invalidity of the claims of the '725 patent. A copy of the verdict sheet is at Docket Item ("D.I.") 231.

The jury answered all of the interrogatories posed by GNB. A copy of GNB's interrogatories is at D.I. 233. The jury answered all of the interrogatories posed by the defendants except numbers 5, 7, 9 and 12. A copy of the defendants' interrogatories is at D.I. 232.

On December 9, 1993, defendants filed a motion for judgment as a matter of law or a new trial under Federal Rules of Civil Procedure 49(b), 50(b) and 59. D.I. 235. On that same day, defendants filed a motion for a Declaration of Mistrial (of the entire case) or in the alternative to Stay the Entry of Judgment Pending Disposition of Certain Post Trial Motions. D.I. 236.

On December 22, 1993, the court declared a mistrial on plaintiff's claim for damages based on the defendants' infringement of the claims of the '725 patent. D.I. 252. On March 14, 1994, the court denied the defendants' Motion for a Declaration of Mistrial (of the entire case), granted their Motion to Stay the Entry of Judgment Pending Disposition of Certain Post Trial Motions, and ordered the parties to proceed as if defendants' motion for judgment as a matter of law had been denied. D.I. 271. In April of 1994, the damage issues were tried to the court.

## DISCUSSION

### I. *Are Defendants Entitled to Judgment as a Matter of Law?*

Having reviewed the evidence presented at trial and the significant procedural events, the court will now consider defendants' arguments that they are entitled to judgment as a matter of law, or alternatively a new trial. Defendants apparently contend that the jury's verdict finding that they failed to prove invalidity of the claims of the '386 patent is erroneous for three reasons. First, defendants appear to challenge the jury's finding on the issues of indefiniteness and enablement. Second, defendants challenge the jury's finding on obviousness. Third, defendants appear to argue that if the validity of the patent is sustained, its battery does not infringe the claims of the '386 patent. Each of these contentions will be considered in turn.

### A. By What Standard Must This Court Review the Jury's Verdict?

Defendants moved for judgment as a matter of law at the close of evidence, and the court denied this motion. Defendants have renewed their motion pursuant to Federal Rule of Civil Procedure 50(b).

In deciding whether to grant a motion for judgment as a matter of law, the court must view the evidence in the light most favorable to the non-moving party and determine whether the record contains the minimum quantum of evidence from which a jury might reasonably afford relief. *Parkway Garage, Inc. v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993) (reversing a trial judge's grant of a post-verdict judgment as a matter of law on the issue of scienter). The court may not weigh evidence, determine the credibility of witnesses, or substitute its version of the facts for that of the jury. *Id.* In other words, the defendants must show either that the jury's findings of disputed material facts are not supported by substantial evidence, or that those findings cannot support the legal conclusions to be implied from the verdict. *Mars, Inc. v. Conlux USA Corp.,* 818 F.Supp. 707, 711 (D.Del.1993); *see also Therma–Tru Corp. v. Peachtree Doors Inc.,* 44 F.3d 988, 992 (Fed.Cir.1995) (reviewing jury's verdict that invalidity for obviousness had not been proved under the substantial evidence standard).

### B. Could a Jury Reasonably Have Concluded that the Defendants Failed to Show by Clear and Convincing Evidence that the Claims of the '386 Patent Were Invalid for Lack of Enablement or Indefiniteness?

Defendants contend that the jury erred in finding they had failed to show by clear and convincing evidence that the '386 patent was invalid either because the claims were indefinite or non-enabling. Defendants argue that Figure 7 of the '386 patent, the only figure showing the two-armed bushing, does not teach how to substantially completely embed that bushing in the cover.

GNB responds by arguing that substantial evidence in the record supports the jury's finding that the '386 patent contains a description in such full, clear, concise, and exact terms as to enable any person skilled in the battery art to determine how much of the bushing shown in Figure 7 is embedded in the plastic and supports its verdict that the defendants failed to prove by clear and convincing evidence that claims 1–10 of the '386 patent are invalid. For example, GNB points to the testimony of its expert witness John Devitt who testified that while Figure 7 did not show the extent to which the two-armed bushing was embedded, the specification of the '386 patent referred the reader to other figures in the patent and to other sections in the specification describing embedment.

In addition, GNB points to the testimony of both Musgrove, an Exide engineer, and Luzader, the vice president for engineering at Exide, who testified that they understood the claims and disclosure in both the '386 and '725 patents. In fact, GNB notes that no witnesses testified that they did not comprehend the '386 patent.

This evidence cited by GNB confirms that the record contains substantial evidence to support the jury's finding that the '386 patent contains a description in such full, clear, concise, and exact terms as to enable any person skilled in the battery art to determine how much of the bushing shown in Figure 7 is embedded in the plastic. Substantial evidence also supports the jury's verdict that defendants have not shown by clear and convincing evidence that the '386 patent is invalid for failure to comply with 35 U.S.C. § 112. The court will therefore deny defendants' motion for judgment as a matter of law on this issue.

### C. Could a Jury Reasonably Have Concluded that the Defendants Failed to Show by Clear and Convincing Evidence that the Claims of the '386 Patent Were Invalid for Obviousness?

Defendants also contend that the jury erred in its verdict that defendants had failed to prove by clear and convincing evidence that the claims of the '386 patent were invalid for obviousness. In challenging the jury's verdict, the defendants appear to be making

598

two arguments. First, defendants contend that the evidence offered at trial together with alleged binding admissions made by GNB establish that each and every element of the claimed invention exists in prior art, and that therefore the invention is obvious. Second, in their reply brief, defendants attempt to argue that evidence offered at trial together with alleged binding admissions made by GNB establish that the prior art suggests or teaches the combination of elements to render the claims of the '386 patent invalid for obviousness.

1. Does the fact that the claims of a patent describe an invention that is merely a combination of known elements render that claim invalid for obviousness?

■ Defendants appear to argue that the mere existence of all of the elements of a claimed invention in the prior art renders the claims of a patent invalid for obviousness. GNB responds by arguing that such an argument is an attempt to resurrect language in *The Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.*, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950), a decision which may have suggested such a result.

Following the Supreme Court's decision in *Graham v. John Deere Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966), the Federal Circuit requires that the statutory requirements for obviousness be applied regardless of whether the invention is a combination of old elements. *See, e.g., Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1549 (Fed.Cir. 1983). As the Federal Circuit explained: "Virtually every invention is a combination of old elements or process steps, and synergism . . . is not *required* for patentability." *Id.*

■ In seeking to determine whether an invention which is a combination of known elements would have been obvious to the hypothetical person skilled in the art at the time of the invention, the references cited to demonstrate obviousness must be considered in their entirety to ascertain whether the words and diagrams in those references suggest the combination. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1567 (Fed. Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987). Where those references do not suggest the combination or

in fact suggest something other than the combination, then a finding of obviousness is not warranted. *Id.* at 1568. In fact, the court instructed the jury in accordance with this rule of law.

Consequently, the mere existence of all the elements in the claims of the '386 patent in the prior art does not mandate a finding of obviousness as a matter of law. The court will deny defendants' motion on this ground.

2. Does substantial evidence support the jury's verdict that the defendants had failed to prove by clear and convincing evidence that the claims of the '386 patent are invalid for obviousness?

■ The defendants argue that each and every element of the claimed invention is disclosed in the prior art. Furthermore, the defendants argue both that the prior art suggests the combination of elements to render the claims obvious and that GNB has admitted that it would have been obvious to combine these prior art references which would render the claims of the '386 patent invalid for obviousness.

For example, defendants argue that Kump, in his affidavit, admitted that it would have been obvious to move the top terminal shown in the Japanese Publication to the centerline and substitute known side terminals, such as the side terminal shown in Figure 10 of the Halsall patent. In addition, defendants argue that Kump admitted that the Japanese Publication depicted a dual-terminal battery with bushings substantially completely embedded in the cover as those words are used in the patent. Defendants argue that the jury should have been instructed that these statements were binding on GNB, and that, therefore, these admissions render the claims of the '386 patent invalid.

Defendants place great weight on prior statements attributable to GNB in arguing that the jury erred in not finding the claims of the '386 patent invalid. In fact, in their reply brief, defendants essentially state that GNB admitted the obviousness of the invention claimed in the '386 patent and that this admission is binding on GNB. According to the defendants, the jury should have been instructed to follow them. Under the federal

rules of procedure and evidence, the label "admission" has special significance. For example, under Federal Rule of Evidence 801(d)(2), a prior statement by a party may be admissible against that party at trial even though it might otherwise be inadmissible hearsay because it is an admission. In addition, under Federal Rule of Civil Procedure 8(b), when answering a pleading a party may admit certain facts which the parties would then not contest during the course of trial.

Defendants are really arguing that GNB should be estopped from contesting certain facts because of past statements. This court has previously explained, "There is some authority, under the doctrine of 'judicial estoppel,' for the proposition that courts will find a party is estopped from obtaining relief based on alternative and inconsistent positions taken in litigation." *Liposome Co. v. Vestar, Inc.,* No. 92–332–RRM, 1994 WL 738952, at *14 (D.Del.1994). This court went on to state: "The cases recognize, however, that a patent owner will not be precluded from taking inconsistent positions in litigation unless the party opposing the subsequent position demonstrates either personal reliance on a decision granted in the prior suit, prejudice in the current litigation by reason of the prior decision, or the patent holder's apparent misuse of the court." *Id.* at *14 (citing *Hybritech Inc. v. Abbott Lab.,* 849 F.2d 1446, 1453–54 (Fed.Cir.1988)). No evidence, however, has been offered which would support a finding that these standards have been met in this case.

■ The better position, as this court concluded in *Liposome,* on the significance of the prior statements is that they are relevant to show how GNB read the claims of the McGuire patent and how it interpreted certain prior art references and suggestions of combinations in the prior art at a time when it was not advocating the validity of claims in its own patent as a "necessary step in building a claim for relief that moves from complaint to recovery." These statements are also evidence of how one skilled in the art would read the prior art references cited in the previous litigation between GNB and Chloride. Consequently, rather than considering the statements as binding admissions,

the jury was free to consider this evidence in its decision on obviousness along with the evidence offered by GNB, for example, explaining the significance of those statements, as well as the other evidence offered by GNB on whether the prior art suggested the combination.

Defendants also argue that the combination of the side and top terminals of the Die Hard Incredicell batteries as depicted by Figures 10 and 12 of the Halsall patent render the claims of the '386 patent invalid for obviousness. Defendants argue that other dual-terminal batteries such as the Torque Starter battery depicted and described in the McGuire patent would have provided the suggestion to combine the side and top terminals in Halsall to one of ordinary skill at the time of the invention.

In opposition to the motion, GNB argues that there is substantial evidence in the record to support the jury's verdict that defendants had failed to prove by clear and convincing evidence that claims 1–10 of the '386 patent are invalid. For example, GNB points to testimony by Kump and Devitt explaining the significance of the statements made in the brief and affidavit filed in the prior litigation involving the McGuire patent. This testimony shows that the claims of the McGuire patent were much broader than those of the '386 patent. GNB argues that any statements made by Kump must be read in that light.

In addition, GNB points to Jergl's testimony at trial where he explained his prior deposition testimony. For example, Jergl testified that what he meant by his statement in his deposition regarding the Halsall patent was that "the bushing was physically embedded in the cover to the extent that it can be practically done." He noted, however, that batteries made in accordance with that patent leaked and were taken off the market by JCI.

GNB also points to the Anderson patent and statements made by defendants during the prosecution of that patent. GNB argues that the words of this claim describe the same invention that is described by the words in the claims of the '386 patent. GNB supports this argument by pointing to a re-

jection of this claim by the examiner in the PTO who stated that this claim was "clearly" anticipated by the '725 patent, which depicts in Figure 7 the bushing described by the words in the claims of the '386 patent. GNB argues it is significant that in 1987 the defendants were arguing for the patentability of the very same invention they now claim is obvious.

In addition, during the prosecution of this patent General Battery filed an Information Disclosure Statement which stated that Halsall did not teach "a single cover that can accept both cable pressure clamps and cable ends for side mount terminals." After indicating that the most pertinent prior art included those references cited by the defendants in this litigation, General Battery stated that "the art contains no teaching that these references could or should be combined."

GNB points to the testimony of its expert witness John Devitt who testified extensively on the obviousness issue. For example, Devitt disagreed with Knowles's conclusion that the '386 patent would have been obvious to one of ordinary skill in the art at the time of the inventions. He testified that there is no teaching and no background information in the prior art that actually points in the direction the defendants argue. For example, he stated that the Japanese Publication does not disclose a dual-terminal battery of the type that is the subject of the '386 patent. Devitt further testified that McGuire would not have provided the suggestion to combine Halsall's side and top terminal bushings because McGuire describes a complicated structure with two element posts and very little embedment of the terminal connections. Finally, he stated that one of ordinary skill in the art would not look at McGuire and disregard Halsall's teaching of three batteries with separate terminal structures. In Devitt's opinion there are significant differences between the one-piece bushing embedded in the cover as described by the words in the claims of the '386 patent and those bushings described and depicted in the various patents and publications offered by the defendants as prior art. He further opined that none of the patents or publications teach or suggest combining the various components described, in combination, by the claims of the '386 patent.

GNB also notes that defendants base their attack on the '386 patent upon prior art, which is the same as, or less relevant, than that which was before the Patent Office during the prosecution of that patent. According to GNB, defendants have not met their burden of showing that the PTO did not properly perform its administrative function in reviewing this prior art and granting the '386 patent. See Custom Accessories v. Jeffrey–Allen Indus., Inc., 807 F.2d 955, 961 (Fed.Cir.1986). The jury was free to consider this fact in the obviousness inquiry.

Finally, GNB argues that the defendants' claim that the invention is obvious is rebutted by the jury's findings on secondary considerations of non-obviousness. In answers to written interrogatories, the jury found that the invention of the one-size-fits-all battery of the '386 patent met an unfulfilled need for a dual-terminal battery product which addressed and solved the manufacturing and inventory problems caused by the large number of different batteries required by the automotive market. In addition, the jury found that General developed their dual-terminal battery with knowledge of the Kump and Jergl invention.

Defendants respond by arguing that the batteries made in accordance with the '386 patent could not have solved a long-felt need, as the jury found, due to the success of the Torque Starter dual-terminal battery. Exide offered testimony at trial that the Torque Starter successfully reduced inventory and that many Torque Starter batteries were sold both by Chloride and by GNB. Defendants further argue that the failures associated with the Torque Starter battery, brought out at trial through testimony offered by GNB, were the result of design features of the Torque Starter not relevant to the claims of the '386 patent. Finally, the defendants argue that the jury's finding that the invention claimed in the '386 patent did not enjoy commercial success weakens these secondary considerations.

While the invention of the '386 patent was not the first dual-terminal battery to be sold

on a wide scale, the evidence suggests that it was a more reliable product than the Torque Starter battery, in part due to the construction and embedment of the bushings as claimed in the '386 patent. Therefore, the court finds that substantial evidence supports the jury's finding that the invention described by the words in the claims of the '386 patent solved a long-felt need.

GNB also offered testimony that General Battery developed its dual-terminal battery after acquiring a GNB Champion dual-terminal battery. Its testimony showed General copied the angle of the side terminal on the Champion battery and used Champion battery covers in marketing surveys for its own product. The jury specifically found that General developed its commercial product with knowledge of the Kump and Jergl invention. While the court recognizes that GNB's Champion battery is made in accordance with the '725 patent and General's commercial product was found to infringe the '386 patent, the similarities between the two inventions permit a reasonable inference of copying, at least to the extent that it can be used as evidence of non-obviousness. Thus, there is substantial evidence to support the jury's finding on this issue as well.

Defendants argue that the jury's finding that the invention claimed in the '386 patent did not enjoy commercial success supports its position that the secondary considerations do not point toward non-obviousness. However, Exide's sales of many batteries found to infringe the claims of the '386 patent may suggest that the jury's finding on this fact lacks substantial evidence. As a result, the court does not find defendants' argument on this point to be compelling.

The above evidence cited by GNB confirms that there is substantial evidence in the record to support the jury's verdict that defendants did not show by clear and convincing evidence that the claimed subject matter as a whole would have been obvious to a person having ordinary skill in the art at the time of the invention. The court will, therefore, deny defendants' motion for judgment as a matter of law on this issue.

### D. Could a Jury Reasonably Have Concluded That GNB Had Shown by a Preponderance of the Evidence That Defendants' Battery Infringed Claims 1–10 of the '386 Patent?

■ As a final salvo in the post-trial briefing, defendants appear to challenge the jury's verdict that GNB had proven by a preponderance of the evidence that defendants' battery infringed claims 1–10 of the '386 patent. Defendants appear to argue that if the validity of the patent is sustained their dual-terminal batteries cannot be found to infringe the claims of the '386 patent. However, defendants point to no testimony in the record to support their position that a certain interpretation of the words in the claims of the '386 patent does not describe their dual-terminal battery. In fact, defendants appear to have offered no testimony at trial to suggest that their battery does not infringe the claims of the '386 patent. Consequently, the court finds that the defendants have failed to meet their burden of showing an absence of substantial evidence to support the jury's verdict on this issue and will deny defendants' motion on this ground.

### E. Conclusion on Judgment as a Matter of Law

In conclusion, the court finds that the record contains the minimum quantum of evidence from which a jury might reasonably afford relief in favor of the plaintiff and against the defendants on the issues of infringement and validity of claims 1–10 of the '386 patent. Consequently, the court will deny defendants' motion for judgment as a matter of law on these issues. Furthermore, the court will also deny defendants' motion for a new trial on these issues.

### II. Are Defendants Entitled to a New Trial Because of Alleged Errors?

In addition to their argument that the court should grant judgment as a matter of law in its favor or order a new trial because the jury erred in its verdict on the issues of validity and infringement of the '386 patent, defendants contend that a new trial must be granted because of seven alleged errors committed during the course of trial.

The first error defendants allege in support of their motion for a new trial is that the court failed to direct a verdict in favor of the defendant on the scope and meaning of certain patents offered as prior art. The court instructed the defendants to delete certain written interrogatories from their proposed list because the plaintiff did not contest the particular finding of fact. For example, defendants' proposed interrogatories contained the question: "Do you find that the Chloride Torque Starter battery was commercially available in the United States prior to August 30, 1984?" In arguing that this interrogatory should not be given to the jury, plaintiff stated that it did not contest the fact that the Chloride Torque Starter battery was commercially available prior to that date. Defendants then sought to have the court direct a verdict in their favor on those findings. The court refused to direct a verdict for the defendants on those facts and instead suggested that defense counsel simply argue to the jury that certain facts were uncontested by the plaintiff. In addition, the court instructed the jury that attorney argument was not evidence.

■ Defendants argue it was error for the court to instruct the jury that attorney argument was not evidence while, at the same time, suggesting to defense counsel that it should tell the jury these facts were uncontested. Plaintiff responds by arguing that there was no error in refusing to direct a verdict on these facts or to instruct the jury that plaintiff had admitted these facts. The court informed defense counsel that he could simply explain to the jury that plaintiff had admitted these facts if they have any legal significance.

The court finds no error in refusing to direct a verdict as to what a particular patent discloses or instruct the jury that the plaintiff had admitted what a certain patent discloses. Furthermore, an instruction to the jury that counsel's argument is not evidence does not prevent counsel from pointing out to the jury that no contrary evidence was offered or admitted during the course of trial to contest a particular fact at issue. Counsel can then argue the legal significance of that uncontested fact to the jury. Consequently, the court will deny defendants' motion for a new trial on this alleged error.

■ The second ground raised by defendants in support of their motion for a new trial is that the court erred by instructing the jury that "the Affidavit of William H. Kump, the defendants' models, videotape, and charts are not prior art and cannot be used to provide a suggestion to combine prior art references" and by instructing the jury that "[i]t is irrelevant that some or all of the elements of the claims of GNB's patents may have been old." The court instructed the jury as follows:

If you find the available prior art shows each of the elements of the claims in suit, you must determine whether it would then have been obvious to a person of ordinary skill in the art at the time of the claimed invention was made to combine or coordinate these elements in the same manner as the claims of GNB's patents. The difficulty that attaches to all honest attempts to answer this question can be attributed to the strong temptation to rely on hindsight while undertaking this evaluation.

It is wrong to use the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit. If you find that when the disclosures of more than one reference are combined, those references show all of the elements of an asserted claim, you must then ask whether it would have been obvious to the person of ordinary skill in the art to combine these elements from the references in the same manner as the asserted claim. You cannot first determine what the inventors did, and then use hindsight to view the prior art in such a manner as to select from the various references only those elements which may be modified and then utilized to reconstruct the claimed invention. There must be some teaching or suggesting in the prior art references to support their use in combination. In this regard, the Affidavit of William H. Kump, the defendants' models, videotape, and charts are not prior art and cannot be used to provide a suggestion to combine prior art references.

It is irrelevant that some or all of the elements of the claims of GNB's patents may have been old. Virtually all inventions are combinations and virtually all are combinations of old elements. You must consider whether the invention as a whole was taught by the prior art, not merely whether individual elements or features of the claimed process are found somewhere in the prior art.

Specific elements of an asserted claim in a reference cannot be combined with specific elements of that claim shown in other references, unless there is some suggestion or incentive to do so. Something in the references must suggest the desirability, and thus the obviousness, of making the combination. Accordingly, unless there is a teaching to combine elements from the references in the manner shown in an asserted claim, the presence of elements of that claim in various references does not mean that the claim would have been obvious.

Following the charge to the jury and closing arguments, defense counsel made an application to the court that the court's instruction regarding the models, videotape, and Kump affidavit were incorrect and that the court should give a corrective instruction. The court agreed and gave the following corrective instruction to the jury:

In the jury instruction at Page 43, it is Instruction 5.1—Obviousness—Hindsight, the sentence reads:

"In this regard, the affidavit of William H. Kump, the defendants' models, videotape and charts are not prior art and cannot be used to provide a suggestion to combine the prior art references."

That last portion of that sentence, I think, is a mistake on my part to have put in as a matter of law. That is, the sentence should stop before the final phrase "and cannot be used to provide a suggestion to combine prior art references."

So that the sentence should now read only:

"In this regard, the affidavit of William H. Kump, the defendants' models, videotape and charts are not prior art."

After giving the corrective instruction, the court explained to the jury that it was not emphasizing that issue and the court reminded the jurors that the Kump affidavit was in evidence but that the videotape, models, and charts may not be in evidence. In addition the court read short statements from both parties on the corrective instruction.

Plaintiff responds by arguing that the statement was legally correct as it originally was read to the jury and that in any event the corrective instruction cured any alleged error. With respect to the statement that "[i]t is irrelevant that some or all of the elements of the claims of GNB's patents may have been old," case law suggests that the court's instruction was legally correct. See, e.g., Rosemount, Inc. v. Beckman Instr., Inc., 727 F.2d 1540, 1546 (Fed.Cir.1984) ("[A] combination may be patentable whether it be composed of elements all new, partly new, or all old."). Furthermore, when this statement is read in context with the entire instruction it is not misleading. With respect to the statement about the models, affidavit and videotape, the court finds that the corrective instruction cured any potential error or confusion. For this reason, the court will deny defendants' motion for a new trial on this alleged ground.

The third and fourth grounds raised by defendants in support of their motion for a new trial are that the court erred in refusing to admit a videotape and models prepared by the defendants. Defendants argue that these models and the videotape prepared by defendants' expert witness Knowles are relevant and that, as such, are admissible under Federal Rule of Evidence 402. According to defendants, the court excluded the models and the videotape because they were argumentative which is not a ground for excluding evidence. Defendants argue their expert authenticated the models and the videotape and tied them specifically to figures in various patents asserted as establishing the obviousness of the claims of the '386 patent. Defendants contend these models provided a three-dimensional view of otherwise two-dimensional drawings crucial to the jury's understanding of what the patents depicted in their drawings and described in their specifi-

cations. Finally, defendants argue that by excluding these models and then instructing the jury it could not use them in its deliberations, the court created the impression in the minds of the members of the jury that they could not consider the impressions they may have formed from the use of the models and the videotape during the course of the trial.

Plaintiff responds by arguing that the court properly refused to admit the models and the videotape as substantive evidence which the jury could then take into the jury room during deliberation. Plaintiff notes that these models are not themselves prior art from which a jury could find that a claim of a patent was invalid. Furthermore, plaintiff argues that these models do not even fairly represent the prior art offered and admitted at trial and should have been excluded as highly prejudicial under Federal Rule of Evidence 403.

The court finds no error in the refusal to admit these demonstrative exhibits into evidence which the jury could take into the jury room during deliberation. The court stated in its ruling that "the jury is entitled to look at those and use them to help them understand the evidence during the course of the trial, but they are not evidence and you won't have them in the jury room during the deliberations." Therefore, the court permitted the jury to see the models and view the videotape with the understanding that they represented the opinion of the defendants as to what certain patents and publications offered as prior art described or depicted.

■ A trial court has the discretion to allow the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence. *Pierce v. Ramsey Winch Co.*, 753 F.2d 416, 431 (5th Cir.1985). Such aids are not themselves evidence and, absent the consent of all parties, should not be sent to the jury room. *Id.* They are more "akin to argument than evidence." *Gomez v. Great Lakes Steel Div. Nat'l Steel Corp.*, 803 F.2d 250, 257 (6th Cir.1986). Consequently, it was not error to refuse to admit the models and videotapes into evidence, and the court will deny defen-

dants motion for a new trial on this alleged error.

■ The fifth ground raised by defendants in support of their motion for a new trial is that the court erred in submitting a verdict form to the jury which listed the questions of infringement first instead of the questions on validity. Defendants argue that one cannot infringe an invalid patent and thus the jury must first consider the validity question. The court finds no error in permitting the issues of infringement to appear before the issues of validity. The jury is instructed to reach a verdict if possible on all of the issues. Furthermore, the infringement issues were presented first by the plaintiff during the course of the trial. Thus, the questions merely track the presentation of evidence. Consequently, the court will deny defendants' motion for a new trial on this ground.

■ The sixth ground raised by defendants in support of their motion for a new trial is that the court erred in permitting plaintiff's patent expert to offer his opinion that the Kump affidavit would have been given little if any weight by a patent examiner in considering the Kump and Jergl applications. Defendants argue that this witness was qualified only to give opinions on PTO procedure and that this opinion went to issues beyond the scope of his qualifications.

Plaintiff responds by noting that their expert's opinion went to the weight that an examiner would have given to this particular affidavit and that as such it was appropriate. Furthermore, plaintiff notes that defense counsel failed to cross-examine plaintiff's patent expert on this issue. Finally, plaintiff argues that the jury was properly instructed on opinions given by expert witnesses and the weight those opinions should be given.

The court finds no error in permitting this testimony. Defense counsel was free to test the foundation for plaintiff's expert's opinion on this issue during cross-examination. Consequently, the court will deny defendants' motion for a new trial on this ground.

■ The final ground raised by defendants in support of their motion for a new trial is that the court erred by not properly

instructing the jury on its ruling on the admissibility of the briefs and affidavit in the prior litigation between Chloride Group and GNB. Defendants argue that, during the course of trial, plaintiff had objected to the admission of these documents on grounds of relevancy. Defendants, on the other hand, argued that, not only were these documents relevant, but that they should be admitted in their entirety. The court initially ruled that only portions should be allowed into evidence. Plaintiff's counsel then argued that if portions of the brief and affidavit were going to be admitted that the entire brief and affidavit should be admitted. However, during closing arguments plaintiff's counsel argued that defendants only wanted portions of the brief admitted while plaintiffs wanted the entire brief admitted. This alleged misstatement, according to defendants, went uncorrected by the court. Defendants argue that this statement by plaintiff's counsel during closing arguments discredited defense counsel by implying that counsel was attempting to hide portions of the brief from the jury.

Plaintiff responds by arguing that defendants waived the right to challenge this statement by failing to object during closing arguments. Plaintiff also argues that this comment read in context only suggested that the defendants' position throughout had been to select items from the prior art and combine them without focusing on the prior art as a whole or the invention as a whole.

While the court notes that plaintiff's comments were incorrect, defense counsel failed to object and thus waived the right to object after trial. Furthermore, even had defense counsel objected, such a misstatement by plaintiff's counsel would not warrant a new trial. Consequently, the court will deny defendants' motion for a new trial on this ground.

*CONCLUSION*

For these reasons, the court will deny defendants' motion for judgment as a matter of law, or alternatively, for a new trial on the issues relative to the '386 patent.