**GNB BATTERY TECHNOLOGIES, INC., Plaintiff,**

v.

**EXIDE CORPORATION and General Battery Corporation, Defendants.**

Civ. A. No. 88–407–RRM.

United States District Court, D. Delaware.

April 26, 1995.

See also:  876 F.Supp. 605.

Robert H. Richards, III, Richards, Layton & Finger, Wilmington, DE and Gordon R. Coons, Charles H. Mottier, Pamela J. Ruschau, Leydig, Voit & Mayer, Chicago, IL, for plaintiff.

Paul E. Crawford, James D. Heisman, Connolly, Bove, Lodge & Hutz, Wilmington, DE, and Frank J. Benasutti, Benasutti, P.C., Wynnewood, PA, for defendants.

## OPINION

McKELVIE, District Judge.

In this patent case, the parties have tried the damage issues, including willful infringement, to the court following a jury verdict in favor of the plaintiff. In this phase, plaintiff seeks an award of lost profits for sales of infringing as well as non-infringing batteries to three retailers and an award based on a reasonable royalty for the remaining sales of infringing dual-terminal, automotive replacement batteries. Plaintiff also seeks an increase in the damages for willful infringement and prejudgment interest.

Following a bench trial on the damage issues, the parties filed briefs on the issues presented to the court during the course of that trial. On September 7, 1994, the court heard oral argument on these issues. This opinion provides the court's findings of fact and conclusions of law on the damage issues.

*FACTS AND PROCEDURAL HISTORY*

The facts and procedural history relevant to the liability issues in this case are set forth in the court's two Opinions of February 10, 1995, in which the court denied defendants' motion for judgment as a matter of law and for a new trial. *GNB Battery Technologies,*

*Inc. v. Exide Corp.*, 876 F.Supp. 582 (D.Del. 1995); *GNB Battery Technologies, Inc. v. Exide Corp.*, 876 F.Supp. 605 (D.Del.1995). Facts and procedure will be repeated only to the extent necessary to present a complete understanding of the issues before the court in this phase of the trial.

Plaintiff, GNB Battery Technologies, Inc. ("GNB") contends it is entitled to compensatory damages for sales of 4,488,017 infringing dual-terminal batteries by Exide Corporation ("Exide") and General Battery Corporation ("General") (hereinafter referred to collectively as "Exide" or defendants). In particular, GNB seeks its lost profits for Exide's sales of infringing dual-terminal and non-infringing single-terminal automotive replacement batteries to KMart, Firestone, and Montgomery Ward. It also seeks its lost profits for sales of single- and dual-terminal batteries made to those retailers by Exide after it had switched to a non-infringing alternative until certain contracts with those retailers terminated. For all other sales of infringing dual-terminal batteries made by Exide, GNB seeks damages based on a reasonable royalty. In the alternative, should the court find GNB is not entitled to lost profits, GNB contends it is entitled to an award of a reasonable royalty on all sales of infringing batteries.

This Opinion will first set forth the procedural events relevant to the damage issues. It will then discuss the battery market and the various competitors and products. Next, it will set forth facts relevant to plaintiff's claims for lost profits for sales to KMart, Firestone, and Montgomery Ward, as well as plaintiff's claim for a reasonable royalty, and willful infringement. It will then discuss the court's findings of fact and conclusions of law based on the facts. Finally, the Opinion will address plaintiff's claim for prejudgment interest.

A. *Significant Procedural Events Relevant to the Damage Issues*

GNB owns United States Patents 4,645,725 ("the '725 patent") and 4,701,386 ("the '386 patent"), which cover dual-terminal automotive replacement batteries with particular terminal configurations. On July 18, 1988, GNB filed this action alleging in their complaint that Exide and General were willfully infringing the '725 and '386 patents.

By stipulation entered on April 27, 1989, the parties agreed to stage the trial and try the liability issues first to the jury followed immediately, if necessary, by the damage issues. Docket Item ("D.I.") 22. Trial of the liability issues began on November 12, 1993. However, on November 23, 1993, the parties agreed to try the damage issues to the court at a later date. D.I. 244.

On November 29, 1993, the jury returned a verdict in favor of GNB and against defendants on GNB's claim that defendants infringed certain claims of the '386 and '725 patents, as well as on defendants' claim that the '386 patent was invalid. The jury was unable to reach a unanimous verdict on defendants' claim that the '725 patent was invalid. Copies of the verdict and interrogatory forms can be found at Docket Items 231, 232, and 233.

On December 9, 1993, defendants filed a motion for judgment as a matter of law or a new trial under Federal Rules of Civil Procedure 49(b), 50(b) and 59. D.I. 235. On that same day, defendants filed a motion for a declaration of a mistrial of the entire action, or, in the alternative, to stay the entry of judgment pending the disposition of certain post-trial motions. D.I. 236.

On December 22, 1993, the court declared a mistrial on plaintiff's claim for damages based on the defendants' infringement of the '725 patent. D.I. 252. On March 14, 1994, the court denied defendants' motion for a mistrial on the entire action and granted their motion for a stay of entry of judgment. D.I. 271. In April 1994, the parties tried the damage issues to the court.

In an Opinion dated February 10, 1995, the court indicated it would deny defendants' motion for judgment as a matter of law, or in the alternative, for a new trial pursuant to Rules 50 and 59. *GNB Battery Technologies, Inc. v. Exide Corp.*, 876 F.Supp. 582 (D.Del.1995). In a second Opinion issued that same day, the court indicated it would deny defendants' motion for a new trial pursuant to Rule 49(b). *GNB Battery Technolo-*

*gies, Inc. v. Exide Corp.*, 876 F.Supp. 605 (D.Del.1995). On February 15, 1995, in accordance with the Opinions of February 10, the court entered an Order denying defendants' motion. D.I. 321. In that Order, the court also indicated it would continue to defer the entry of final judgment pending the disposition of the damage issues.

B. *Overview of the Automotive Battery Replacement Market*

GNB manufactures and sells batteries nationwide for a wide range of uses including for the replacement of batteries in automobiles. For this automotive replacement market, GNB sells a number of different batteries varying in size, power, and terminal configuration. In 1983, GNB sold approximately 9 million automotive batteries of all types and sizes. By 1994, GNB's annual sales had grown to over 17 million batteries. In 1987, GNB was sold to Pacific Dunlop Ltd. of Australia.

In 1985, GNB introduced a dual-terminal battery called the Champion dual-terminal battery. This battery utilized an L-shaped or one-armed bushing embodied in the '725 patent. GNB has not sold a battery embodying a T-shaped, or two-armed bushing claimed in the '386 patent. Prior to 1985, GNB sold other dual-terminal batteries such as the Torque Starter. Since 1985, GNB has sold more than 10 million Champion brand dual-terminal batteries.

Exide and General also manufacture and sell a wide range of batteries for varying applications nationwide. In late 1987, Exide acquired General, and thereafter they did business as Exide. In 1986, prior to this acquisition, both Exide and General independently introduced new dual-terminal batteries. Exide's dual-terminal battery had a one-armed bushing and was found by the jury to infringe claims of the '725 patent. General's dual-terminal battery employed the two-armed bushing and was found to infringe claims of the '386 patent. After the acquisition, Exide discontinued production of the dual-terminal battery with a one-armed bushing and instead continued only to produce the battery with a two-armed bushing originally marketed by General. In 1991,

Exide switched to a non-infringing dual-terminal battery.

Delco and Johnson Controls, Inc. ("JCI") are the other major battery manufacturers in the United States. Delco introduced a dual-terminal battery in 1990. JCI, makers of the Incredicell line of batteries, introduced a dual-terminal battery with an angled side terminal in 1987. The major battery makers often compete against one another for the battery business of major retailers such as KMart and Montgomery Ward.

In addition to the larger manufacturers, there are also a number of smaller regional manufacturers. For example, Douglass Battery, Farmland, East Penn Manufacturing Company, and Heston all manufacture and sell a wide range of batteries for the automotive replacement market on a regional basis, including dual-terminal batteries. In fact, in 1986–87, East Penn manufactured at least two types of dual-terminal batteries including one with angled side terminals.

Batteries are sold a number of ways in the automotive replacement market. For example, a retailer, such as KMart, might offer a branded line of batteries such as the Delco brand. This is a battery manufactured by Delco with the Delco trademark on the battery but sold through a retailer. In addition, a retailer might also sell a private label battery line. For example, KMart sold a line of batteries under the "Motorvator" trademark, as its own batteries. These are batteries manufactured by a third party and sold by KMart as its own battery. Often a retailer will sell a combination of branded and private label batteries.

In addition to selling a variety of battery brands, a retailer will also sell a wide range of batteries varying in size, power, and warranty. For example, typically a retailer will offer a selection of low-priced or economy batteries, in varying sizes. An economy battery would have a low power rating and short warranty. In addition to the economy grade of battery, a retailer will also offer higher grades of batteries up to a premium line of batteries. A premium line of batteries would be characterized by a high power rating and a long warranty. The dual-terminal batter-

ies from the various manufacturers usually had a high power rating and long warranty periods. In addition to automotive replacement batteries, retailers also offer specialty batteries, such as marine or tractor batteries.

It was not uncommon for a retailer such as KMart to buy batteries from several battery manufacturers. Often a retailer would split its business by region. However, retailers could also split their business by battery type depending upon the facts and circumstances.

## C. Facts Relevant to GNB's Claim for Lost Profits

GNB argues it is entitled to its lost profits for Exide's sales of both infringing and non-infringing batteries to KMart, Firestone, and Montgomery Ward in the amount of $49,334,-852. This sum equals the amount of profits less additional tooling costs which GNB alleges it would have had to incur to increase production. Defendants argue GNB would not have made those sales in the absence of infringement by them. The court will address the facts relevant to each retailer in turn.

### 1. Lost Profits for Sales to K–Mart

GNB first argues it is entitled to its lost profits for Exide's sales of infringing and non-infringing batteries to KMart. GNB alleges Exide sold 1,507,654 infringing dual-terminal batteries to KMart from August 1, 1988, when KMart awarded Exide a contract to supply batteries to it, until August 31, 1991. GNB also claims Exide sold 3,237,874 non-infringing single terminal batteries for which it is also entitled to lost profits. GNB claims it is entitled to damages in the amount of $11,929,529 for the infringing sales and $14,998,620 for the non-infringing sales.

GNB called Thomas Olerin Minner, Vice-President and General Manager of the Automotive Battery Division at GNB, to testify on lost profits for Exide's sales to KMart. According to Minner, in 1988, GNB submitted a bid for all of the battery business at KMart.

In the course of this bid process, KMart informed GNB that Delco, its current supplier, had not been sufficiently expanding KMart's battery business. KMart also felt it

was not offering the right mix of batteries. WalMart, one of KMart's chief competitors, was taking tremendous market share of the battery business from KMart and KMart wanted to challenge this, allegedly by emulating WalMart's battery business.

Minner explained that KMart sought a bid from GNB on its battery business. KMart informed GNB that it wished to modify its battery line to include dual-terminal batteries. Its current supplier, Delco, did not offer a dual-terminal battery at that time. Furthermore, according to Minner, KMart wanted to reduce inventory levels in their stores and have a premium priced product.

A letter written by GNB to KMart and dated April 8, 1988, shows that GNB's bid to KMart included dual-terminal batteries. In fact, the letter provides price quotations for a private label dual-terminal battery.

GNB also offered a copy of the presentation it made to KMart in this 1988 bid process. The documents show GNB offered the Champion dual-terminal battery as part of the battery line it proposed to KMart. In addition, GNB offered a dual-terminal battery with KMart's Motorvator label on it, with the same design as the Champion brand. The documents also show the line of batteries proposed to KMart in 1988 included a number of single terminal batteries to be sold under, for example, a low-end KMart private label brand.

Minner testified that GNB and Exide were the last two companies involved in this bid process. Ultimately, KMart awarded the business to Exide. Minner explained: "My view is that the dual-terminal offering is a critical part of the total program offered and that the dual terminal and the conventional offering could not be effectively segregated ... in fact, ... it was identified that the business would be single source, thereby intertwining both the dual-terminal and the conventional line."

KMart put its battery business up for periodic review after 1988. GNB bid at various times after 1988 but was never awarded any of the business. In Minner's opinion, had Exide not offered the infringing dual-termi-

nal battery it would not have been awarded the battery business.

Defendants contend KMart awarded its battery business to Exide because of Exide's superior marketing program. Exide called Joseph C. Calio, III, to testify on lost profits on sales to KMart and also on Exide's approach to marketing for all major accounts. Calio is the Vice–President of Marketing and National Account Sales for the Automotive Division of Exide.

By 1986, Exide had developed a new marketing approach. Exide would first research a potential customer's existing battery business. For example, Exide would analyze stock procedures to see that the oldest batteries were the first to be used to restock. It would review the advertising, including run-of-press newspaper ads, free-standing inserts, TV and radio advertisements, and the labels or battery plaques that are applied to each battery and contain the name and operational information about the battery.

After Exide personnel had gathered information on the current status of a customer, it would develop a proposal to be delivered to that customer. With the first part of the proposal, Exide would set the terms, the freight policy and the cost of the product to the customer. In most cases, the customer will submit a proposed or recommended product line to Exide or other suppliers, and request recommendations as to the competitive nature of the ratings and the retail price points.

With larger accounts, Exide would propose the use of an information system it developed called Exide Express Delivery or SEEDS. Under this system, for certain customers, Exide would essentially take the customer "out of the battery business," such that they would no longer have to handle the heavy, dirty batteries, nor manage returns and warranties or deal with environmental issues. Exide would take responsibility for modeling the battery stock by determining the number of stock keeping units ("SKUs") the customer needed for each battery group size, based on sales data. These models would then be adjusted seasonally based again on sales data.

Also as part of this program, Exide would assume responsibility for inventory control and stock replenishment. It would assign and send Exide personnel into a store to count inventory. This information would be input into a hand-held computer which would calculate the inventory changes for a previous preset period. From this information, Exide would generate an order form on-site and have the automotive center manager sign the order. The Exide employee would then pick up defective and worn out batteries and load them onto an Exide truck. The Exide employee would also set up any point-of-sale material such as a window poster, new header panel for a rack, new channel strip for a rack, an environmental poster in the lobby, a poster in the automotive center, or a bay banner in the automotive center.

The Exide representative would then stock the shelves by taking batteries from the stock room to the sales floor. That person would clean batteries with a mild solvent to enhance their display. At the end of the day, the Exide employee would transmit the orders for the day from the hand-held computer to the appropriate distribution center via modem where orders for additional batteries would be placed.

Exide also created a customized battery applications guide. With this guide, any person could identify a battery for use in his or her car. The guide references particular makes and models of cars against a "good," "better," and "best" battery in the proper size for that car. Each of these batteries is identified by an SKU number. The batteries are arranged on the shelf by SKU. Thus, once the customer identifies the SKU for the battery he or she seeks that customer can easily find the proper battery.

In Calio's opinion, Exide assumed the lead in the industry with its marketing program. This lead was facilitated, at least in part, by Exide's large number of branches nationwide. In fact, at the time, Exide had over 120 branches nationwide from which it could service an account. Exide also utilized trucks specially equipped with pallet jacks and lift gates, which helped facilitate its marketing program.

Calio explained that the Exide Express System provided a number of benefits to customers. It allowed customers to lower costs by reducing the number of employees needed to manage the battery sales. It also substantially increased battery sales at those customers who utilized this system.

Calio testified about a number of specific recommendations Exide made to KMart with respect to KMart's battery business. For example, in 1985 KMart was marketing batteries on a "three-foot flimsy battery rack with header panels [cardboard signs attached to the metal racks] that had price points put on them and pulled off at least 50 to 60 times." On Exide's recommendation, KMart moved from the three-foot rack it had in the back of the store to a ten-foot rack with header panels that indicated the three levels of batteries—good, better, and best. Some KMart stores had up to forty-four feet of racks.

KMart began to use price rails on Exide's recommendation. Price rails permit the retailer to insert a card with the battery price on it. When the price changes, the retailer simply removes the old card and replaces it with a new card. Under the old system KMart would place one adhesive price label on the rack and when the price changed it would have to tear the old label off and place a new one on the rack.

KMart also switched from flat shelving to gravity racks, in which the batteries are placed in the back and slide toward the front of the rack. This rack design helps insure that the older batteries are sold first because they slide to the front and it is difficult for a consumer to reach behind the front battery.

Exide began to advertise its recycling program with KMart in 1989–90. With this program, for each junk battery returned to a KMart store the consumer would be given a $2 certificate or refund. This campaign alone generated over $12.5 million in advertising for Exide and KMart.

Calio explained that Exide's Express Delivery Program was the "key feature, if not the main feature," in its being awarded the KMart battery business. In fact, initially, Exide shared the KMart account with Delco.

However, because Delco failed to establish such a system after two years, it lost the part of the business it had. Calio testified that KMart's sales of batteries increased 33% in the first year Exide had the account.

Referring specifically to the time when Exide acquired the KMart business, Calio explained that when Exide began shipping batteries to KMart in late 1987 dual-terminal batteries were not in the product line. It had shipped a marine battery line to KMart in 1987, again with no dual-terminal batteries. Calio stated that to the best of his knowledge, KMart did not even request dual-terminal batteries when Exide began to service the account. In 1987, KMart did not have a dual-terminal battery in its battery line. Calio noted that KMart's battery buyer, Jim Wright, did express a desire to have a dual-terminal battery in the line.

Calio commented on testimony offered by GNB's Minner. For example, as to the issue of KMart's desire to participate in the "premium" end of the product spectrum, Calio noted that the term "premium" does not refer to the terminal structure of the battery. The term premium as used to describe a battery refers to power level rating in cold cranking amps and reserve capacity. That is, the term "premium" refers to the power and performance of the battery. In fact, according to Calio, Sears, a major national retailer "does not sell a dual-terminal battery." Its premium battery is the Die Hard Gold rated at 900 cold cranking amps. Thus, a retailer does not need to sell a dual-terminal battery to offer a premium battery.

As to emulating WalMart, Calio testified that in 1988 KMart would not have wanted to emulate WalMart in any aspect of its business. KMart stressed in meetings with Exide that it did not want to be compared with WalMart. Delco and General, prior to its acquisition by Exide, jointly supplied the Motorvator line to KMart in 1987. In fact, Calio noted that KMart's sales rose by over 50% from the time Exide began shipping batteries to it in 1987 until the bidding process in 1988.

As to KMart's views of Delco, Calio stated Jim Wright, the KMart battery buyer with whom he had a close relationship, thought highly of Delco. In fact, the final selection in

the many bidding cycles was between Exide and Delco. Other suppliers were never in the final running at KMart for a number of reasons. For instance, they were unable to provide the level of service that Exide provided. Delco had been upgrading its service program to keep pace with Exide and had a reputation for very high quality batteries. According to Calio, in 1988, KMart's final decision was between Exide and Delco. As the result of conversations with KMart's buyer, Exide believed that GNB was eliminated early because its battery program was unacceptable. KMart had similar concerns about Delco's marketing but its excellent product reputation kept it in the running until the end.

GNB also called Goeffrey H. Osborne to testify on lost profits for sales to KMart. Osborne holds a Bachelor of Science in Accounting from Penn State University and a Masters in Taxation from Widener University. He is a Certified Public Accountant in the State of Pennsylvania and a partner in the Advisory Services Group of Coopers & Lybrand.

Osborne explained KMart sought Exide's battery program and not a particular battery. He reviewed documents that suggested even GNB recognized that Exide offered a superior battery program. A GNB internal document dated June 5, 1990, revealed that when GNB previously bid on the business at KMart it only proposed that GNB service a part of the country. Osborne testified that it was clear from his review of GNB's documents that GNB was aware its battery program was inferior to Exide's and the knowledge of that fact led GNB to not offer proposals on subsequent KMart requests for bids.

As to KMart's desire to have a sole source for its battery line, Osborne explained retailers regularly specify a sole source in their bid documents in an effort to elicit the lowest offer from a supplier. Finally, Osborne noted that retailers chose suppliers who would enhance sales of batteries and increase market share.

### 2. Lost Profits for Sales to Firestone

GNB also contends it is entitled to its lost profits for Exide's sales of infringing and non-infringing batteries to Firestone. GNB claims Exide sold 318,463 infringing dual-terminal batteries from 1988 through July 1991. It seeks $2,978,143 in lost profits for those sales. GNB also seeks lost profits for sales of non-infringing single terminal batteries for this time period in the amount of $6,168,752. Finally, GNB seeks lost profits for sales of non-infringing dual- and single-terminal batteries to Firestone after July 1991 through October 1991 in the amount of $998,012. Defendants contend that, as with KMart, Firestone's decision to award it the battery business was based on marketing and that GNB would not have made Exide's sales absent infringement.

Both parties offered and refer to the deposition testimony of Melvin Martin, manager for Firestone and the person responsible for buying the batteries during the relevant periods. He testified that in 1988 GNB and Exide split Firestone's battery business, with Exide supplying 80% of the batteries to Firestone. In 1988, Firestone solicited bids from Delco, JCI, Exide and GNB "asking them to quote on 100 percent of our business." In August 1988, Firestone had eliminated Delco and JCI and was left to decide between its two current suppliers, GNB and Exide. Ultimately the business was awarded to Exide. When asked about the major factors involved in Firestone's decision to select Exide, Martin replied: "The factors that we looked at, obviously, were the cost of the product, service, quality of the product and, in particular, in this case, the ability to provide a direct delivery program." He also explained that the time involved for GNB to move from having 20% of the business to 100% of the business compared to Exide only having to move from 80% to 100% of the business was a factor.

Prior to 1988, Firestone did not offer a dual-terminal battery as part of its line of batteries. However, Firestone did seek bids from parties on a battery line which included dual-terminal batteries. During the course of the bid process, neither GNB nor Exide

discussed the construction of their dual-terminal batteries with Firestone.

GNB offered a letter from Martin to Minner dated August 11, 1988, to which GNB attached a purchase specification. The letter indicates Firestone has "changed the automotive battery line-up to include dual terminal and to incorporate short line sizes so as to increase our market coverage." The letter states: "We would hope that we can make a clear cut distinction between the bids received so as to warrant awarding 100% of our business to one vendor." Item A of the specification, referring to the product line on which GNB was to bid, indicates: "Seller may offer alternatives to particular units" and "In such cases, the key parameter to be considered is cold cranking amps." It further states: "Firestone will not accept technology that has not had a minimum of two years customer exposure in the retail aftermarket."

Plaintiff also called Minner to testify on sales to Firestone. Minner received the bid request from Firestone. He understood that Firestone wished to "dramatically modify" its product line to include dual-terminal batteries. According to Minner, Firestone felt its battery business was not sufficiently large to warrant the administrative costs of keeping two suppliers. Thus, in his opinion, Firestone sought to "single source" its battery business.

Minner explained that in 1988 only GNB and Exide would have been able to meet Firestone's requirement that a product have two years of commercial exposure. Only GNB and Exide sold dual-terminal batteries for more than two years. GNB's Champion dual-terminal battery was part of GNB's bid to Firestone.

Minner indicated that Firestone awarded its battery business to Exide because the economics of the total package offered by Exide was better. In his opinion, had Exide been unable to offer its dual-terminal battery, Firestone would have awarded its battery business to GNB.

3.  Lost Profits for Sales to Montgomery Ward

Third, GNB contends it is entitled to its lost profits for Exide's sales of infringing and non-infringing batteries to Montgomery Ward. GNB alleges Exide sold 672,224 infringing dual-terminal batteries to Montgomery Ward from 1989 through July 1991. It seeks an award of lost profits on those sales in the amount of $4,636,704.00. GNB also seeks lost profits for sales of non-infringing single-terminal batteries in that time period in the amount of $3,138,150. In addition, GNB seeks lost profits for non-infringing, dual- and single-terminal batteries sold by Exide to Ward after July 1991 in the amount of $4,750,359. Defendants contend Ward awarded Exide the battery business because it had become dissatisfied with GNB and its products and because Exide had superior marketing. Absent infringement by Exide, defendants argue, GNB still would not have been awarded the business.

Both parties offered and refer to the deposition testimony of Robert R. Schoeberl of Montgomery Ward on this issue. From 1985 until 1992, the buying organization of Montgomery Ward and Auto Express reported to Schoeberl.

Schoeberl explained that prior to 1989, GNB supplied batteries to Montgomery Ward. In 1989, Ward solicited bids on its battery business. GNB, Exide and Delco submitted proposals on the business. Ultimately, Exide secured Ward's battery business.

According to Schoeberl, in order of importance, Ward looked to marketing plans, pricing, including logistical costs such as delivery, quality and marketing of brands in making its decision on awarding its battery business. On the issue of quality, Schoeberl explained that in 1989, Ward felt that the quality of GNB's batteries had declined from previous levels. On the issue of brands, GNB had initially marketed the Champion brand battery with Montgomery Ward. Eventually GNB decided to market Champion batteries through all of its distribution channels. Consequently, Ward felt that its investment in the Champion brand had deteriorated. However, Schoeberl noted that dual-terminal batteries were a prerequisite

because they had "become a way of life in the battery industry" by 1990.

Schoeberl indicated that in the course of the four to five months Ward evaluated the bids GNB, Exide, and Delco remained in consideration. Ward eliminated Delco only in the final thirty days of the process. Since the bid process in 1989, GNB has not submitted a proposal or made any formal effort to secure Ward's battery business.

GNB also called Minner to testify on lost profits for sales to Ward. He testified that in 1988 GNB's dual-terminal batteries comprised 30% of Ward's total battery sales. This figure represents an increase from 0% when GNB first introduced the dual-terminal battery to Ward in 1985. Minner felt Ward wanted to have a single supplier of batteries as the best way to achieve cost savings. In Minner's view GNB would have made Exide's sales had Exide not infringed the '386 patent.

D. *Facts Relevant to the Amount of Profits Lost*

GNB contends it is entitled to lost profits in the amount of $49,334,852 for sales of both infringing dual-terminal batteries and non-infringing single- and dual-terminal batteries to KMart, Montgomery Ward, and Firestone. GNB called Raymond S. Sims to testify on the amount of profits GNB would have made had it made the sales to these three retailers. Sims is a partner in the management consulting practice with Price Waterhouse in Chicago, Illinois. He holds a Bachelor of Commerce with concentrations in accounting and finance from the University of Calgary in Canada, and a Masters of Management in Accounting Information Systems and Quantitative Analysis from the Northwestern University, Kellogg School of Management, in Evanston, Illinois.

Utilizing information provided by Exide, Sims concluded that Exide sold 4,488,017 infringing dual-terminal batteries. Of those 4,488,017 infringing batteries, GNB claims lost profits for 672,224 batteries sold by Exide to Montgomery Ward from 1989 through July 1991. It claims lost profits for 1,507,654 batteries sold by Exide to KMart from 1988 through July 1991, and it claims lost profits

for 318,463 batteries sold by Exide to Firestone from 1988 through July 1991. For the remaining 1,989,676 infringing batteries sold by Exide, GNB seeks a reasonable royalty of $5 per battery.

Sims testified that GNB seeks lost profits for about 55% of the total sales of infringing batteries made by Exide. In general, Sims calculated profits by subtracting costs and expenses from revenues. In calculating costs, Sims looked to the incremental costs as opposed to fixed costs, such as the president's salary, rent on office space, and rent on other facilities. Sims explained the specific calculation of lost profits for Montgomery Ward for fiscal year 1990. PTX–492 details Sims' calculations for the other retailers and years in question.

Sims first testified to his calculation of the number of infringing batteries sold by Exide. He explained that the infringing batteries sold by Exide to Montgomery Ward were model numbers 26U650 and 34U850. GNB would have sold model number WK2670M in place of the Exide's 26U650 and model number WK3478O in place of Exide's 34U850. Using information provided by Exide, Sims determined that Exide sold 2,082 model 26U650 and 438 model 34U850 to Montgomery Ward during fiscal year 1990. Exide received $61,678 in sales revenue from the 26U650 battery sales and $16,848 in sales revenue from the 34U850 battery sales. Sims used Exide's sales price to Montgomery Ward as the amount of sales revenue that GNB would have obtained because that was the price Ward actually paid. In Sims's opinion, GNB's price would have actually been higher. By dividing the total number of sales of each by their respective sales revenue, Sims calculated an average selling price of $29.62 for the 26U650 battery and $38.47 for the 34U850 battery.

Sims then calculated GNB's manufacturing costs for its comparable batteries. Sims derived this cost by analyzing GNB's cost records and determining which costs would be incurred in order to generate an additional sale of one battery. For the WK2670M battery, Sims calculated the cost per battery at $25.06. For the WK34678O battery Sims

calculated the cost per battery at $29.40. He then calculated the profits lost per battery by subtracting the cost per battery from the sales revenue per battery. For Exide's sales of model 26U650 batteries, Sims subtracted $25.06 from $29.62 to arrive at a lost profit of $4.56 per battery. He then multiplied this figure by the infringing sales of this battery to arrive at a total calculation of profits lost on Exide's sales of model 26U650 batteries for fiscal year 1190 of $9,494. Sims repeated this calculation for Exide's model 34U850 dual-terminal battery. He calculated the lost profit per battery to be $9.07, with total profits lost on sales of this battery at $3,973. Adding the lost profits for the two batteries, Sims calculated the total lost profits for fiscal year 1990 for sales to Montgomery Ward to be $13,467.

He repeated this calculation for fiscal year 1991 and fiscal year 1992, through July 1991, when Exide had completely switched to a non-infringing battery. Sims also calculated lost profits for sales made after July 1991 to the end of fiscal year 1992 and then for fiscal year 1993 until August 1992. In his opinion, because Exide obtained annual contracts, lost profits should be calculated through the period of the termination of the contract. Sims repeated this same set of computations for KMart and for Firestone to arrive at a final dollar value of lost profits. He also calculated a value of lost profits for sales of non-dual-terminal batteries for which GNB claims lost profits as well. A copy of these detailed calculations is at PTX–492.

Defendants appeared to have offered no evidence on the calculation of lost profits. Osborne generally questioned Sims's failure to account for the increase in numbers of batteries GNB would have had to have produced if it had secured the Exide business. However, Osborne offered no alternative calculations.

In addition to claiming lost profits for Exide's sales of infringing dual-terminal batteries to KMart, Firestone, and Montgomery Ward, GNB also claims lost profits for Exide's sales of other non-infringing single-terminal batteries to those three retailers. GNB contends the amount of profits lost on such sales is $25,845,370.

GNB called Sims to testify on this issue as well. As with his testimony on lost profits for infringing dual-terminal batteries, Sims used the sales to Ward to explain his calculations. However, Sims lacked actual sales figures for these batteries as Exide refused to provide discovery on this issue. Lacking this data, he estimated sales numbers to Ward by using information in bid proposals as well as historical data of GNB's sales to Ward.

Sims calculated lost profits for non-infringing batteries for the period from 1989, when Ward awarded the business to Exide, through August of 1992. Sims used this period because in his opinion GNB has not had the opportunity to acquire the business because Ward has not solicited bids since 1989.

Using GNB's historical data of sales of batteries to Ward, Sims found that about 40% of the total battery sales were dual-terminal batteries. Using that information, Sims estimated that Exide sold 3,576 single-terminal batteries to Ward in fiscal year 1990. He then calculated GNB's average selling price of single-terminal batteries to its customers during that time period to be $29.47. Multiplying those two figures together, Sims calculated the total lost single-terminal revenue for Exide's sales to Ward for fiscal year 1990 to be $105,358.

Sims then determined the ratio of cost of production to revenue received expressed in terms of a percentage. For fiscal year 1990, Sims calculated this percentage to be 73.09%. The product of this percentage and the total revenue yields a total manufacturing cost for 1990 of $77,026. Sims then determined the total warranty cost for fiscal year 1990 to be $5206, by analyzing GNB's average warranty cost for that year. To that figure, Sims added the total selling and promotional cost of $9296, calculated using the figures from similar programs at KMart and Firestone. Finally, Sims considered the cost of adding field managers as required in a number of the proposals from the retailers, again using figures from KMart and Firestone to estimate the cost for Ward. Sims added these cost numbers together for a total cost in

fiscal year 1990 of $91,530. Sims then subtracted this figure from the total revenue to calculate the profit lost in that year. This computation resulted in total lost profit on non-infringing, single-terminal batteries for fiscal year 1990 of $13,855. Sims used the same methodology to calculate lost profits for each year in question and for each of the retailers.

Sims explained that he did not include additional tooling and molding costs in the calculation of lost profits for single-terminal batteries because GNB already had the capacity to meet the additional demand. He, however, did include these costs in his calculation of lost profits on infringing dual-terminal batteries. A copy of the detailed calculations can be found at PTX–492.

Exide does not appear to have challenged these calculations or the underlying figures.

E. *Facts Relevant to Claim for a Reasonable Royalty*

In addition to seeking an award of lost profits for Exide's sales of infringing dual-terminal batteries as well as non-infringing, single- and dual-terminal batteries to Montgomery Ward, Firestone, and KMart, GNB also claims entitlement to a reasonable royalty of $5 per battery for the remaining sales of infringing dual-terminal batteries made by Exide to other entities. GNB alleges Exide made 1,989,676 sales for which it seeks recovery of damages based on a reasonable royalty of $9,948,380. Exide, on the other hand, challenges the amount of the reasonable royalty and argues that GNB is only entitled to the cost of changeover to a non-infringing substitute, calculated to be $200,000.

GNB called Minner to testify on the amount of royalty it considered reasonable. Minner indicated he was familiar with the concept of a royalty in exchange for technology. He explained that a number of factors suggested a high royalty rate. For example, in 1987–88, GNB would not have been willing to grant a license under the '386 patent to Exide. Both companies were competing for the same customers and GNB "cherished" the Champion brand dual-terminal battery made pursuant to the '725 patent. GNB would have considered the value of the design, the cost of developing it, the opportunity costs for lost sales on that product if GNB licensed Exide under the patent, as well as sales of other batteries that would accompany sales of dual-terminal sales to factor towards a higher royalty rate.

Minner explained that the gross profit margin for dual-terminal batteries in this time period was $12 to $15 per battery. In his opinion, a reasonable royalty under the '386 patent would have been 50% of the gross profit margin. Minner noted that GNB would not have granted a license under the '386 patent for the amount advocated by Exide as the cost of changeover.

GNB then called Sims to provide background information on the determination of a reasonable royalty and to provide the calculation of the reasonable royalty using the figures testified to by Minner. Sims indicated that Minner provided him with a $5 per battery reasonable royalty rate. He explained that GNB sought lost profits for all but 1,989,676 infringing dual-terminal battery sales made by Exide. He calculated the total reasonable royalty to be $9,948,380 by multiplying $5 times 1,989,676 batteries.

Like Minner, Sims offered expert testimony as to a number of factors which, in his opinion, suggested a high royalty rate. For example, Sims noted that the '386 patent had never been licensed and, in fact, GNB's policy was not to offer licenses under proprietary technology. Sims knew of no comparable licenses. In addition, GNB had expended considerable sums in litigation of this dispute. He also noted GNB and Exide were two of the top four battery manufacturers in the United States and competed for many of the same customers, such as KMart. Sims explained that sales of other batteries often accompanied sales of the patented dual-terminal batteries, which were profitable and increasing. In fact, Sims calculated Exide's incremental profit per dual-terminal battery to be $10.47, as compared with $9.32 for GNB's comparable batteries. Thus, Exide was able to achieve high profitability and acquire a number of retail accounts through the unlawful use of the patented technology.

In addition to being profitable, the patented technology reduces manufacturing costs. It also allows a retailer to carry fewer numbers of batteries because the dual-terminal batteries fit into a number of applications. With fewer batteries in inventory, the retailer is able to offer the consumer a fresher battery, as turnover is higher. Thus, in Sims opinion the patented technology provides value to the manufacturer, retailer, and consumer.

Defendants contend GNB is entitled to a reasonable royalty of no more than the cost Exide would have had to incur in switching from the infringing battery to a noninfringing alternative. Exide called Osborne to testify on the issue of a reasonable royalty.

Osborne testified about a number of factors that he considered suggested a low royalty rate. For example, the battery industry is highly competitive and as a result operates on very thin profit margins in the range of five to seven percent. Furthermore, the battery manufactures experience excess capacity. There are no comparable licenses to determine a reasonable royalty. The price of batteries is driven by power and warranty and not by a particular feature in the internal construction.

Osborne testified about a license agreement between JCI and Globe Union from the 1960s for through-the-wall welding. The royalty rate under this agreement was approximately 1.4 cents per battery.

Exide also called Russell Lloyd Parr to testify on the issue of a reasonable royalty. Parr holds a Bachelor of Science in Electrical Engineering and a Masters of Business Administration in Finance from Rutgers University. Currently, Parr is a Vice President with AUS Consultants. Parr offered his opinion that a running royalty in this case would be zero. He further opined that $200,-000, which is the cost of changing to a noninfringing alternative, would be the maximum amount anyone would be willing to pay to license this technology.

Like Osborne, Parr offered his opinion as to a number of factors that suggest a low royalty rate. Parr testified that batteries are commodity products, or at least perceived as such, in that few features differentiate batteries from one another. Typically, a large number of manufacturers compete to sell commodity products, which results in lower prices and profit margins. In addition, the large number of manufactures provides leverage to the consumer or retailer. A high royalty rate would be unreasonable in such a market.

Parr also considered the '386 patent to be valueless, further suggesting a lower royalty. The specific dual-terminal configuration claimed in the patent does not allow more revenue. The retailers cannot charge a higher price to the consumer for the patented feature. Parr further testified that the patented feature did not permit any cost savings. Finally, a supplier can switch to a noninfringing alternative that costs no more to manufacture and yields the same revenues.

As to the royalty rate advocated by plaintiff, Parr suggested this rate was unreasonably high. He explained that $5 per battery represents between a 15% and 20% royalty rate, which in his opinion is "absurd." Parr offered testimony as to royalty rates paid in other industries. For example, in the highly profitable pharmaceutical industry, a typical royalty rate for significant technology would range between 5% and 15%. Licenses for semiconductor technology are around 3%. In Parr's opinion, a typical royalty rate would be 3% to 5% between competitors for defining technology.

Parr explained that the low profitability in the battery industry affected the royalty rates for licenses. A typical trademark license would be in the range of 7% to 10%. However, GNB paid only 2.5% for the Champion bow tie trademark.

Parr then provided testimony on a number of factors relevant to the calculation of a reasonable royalty. For example, Parr had viewed a videotape from GNB in which GNB indicated it had licensed technology to eight companies in eight countries. GNB and Exide are clearly competitors. Parr noted that the specific configuration of the terminals has no bearing on the sales of the batteries or on other batteries. Though dual-terminal batteries are commercially successful, the particular terminal configuration has nothing to

do with the commercial success of dual-terminal batteries. Parr explained that the use of the patented invention does not allow the retailer to charge a premium price or the manufacturer to realize cost savings in manufacturing. The patented feature does not improve the performance of the product for the ultimate consumer. Also, use of the patented feature is not the only way for the manufacturer to participate in the dual-terminal product category due to the availability of non-infringing alternatives.

In Parr's opinion, in the course of a hypothetical negotiation over the '386 patent a willing licensor and licensee would agree to a one time up front royalty of between $200,000 and $300,000. This amount would reflect the cost of changeover to a noninfringing alternative.

F. *Facts Relevant to GNB's Claim of Willful Infringement*

In addition to seeking compensatory damages for the injuries suffered as a result of Exide's infringement of the '386 patent, GNB asks the court to treble the damages because it contends Exide willfully infringed the '386 patent. GNB contends under the totality of the circumstances a reasonable person could not have conducted himself with any confidence that a trier of fact might hold the patent invalid or not infringed. Defendants deny the infringement was willful and argue that even in the event the infringement is determined to be willful increased damages are not warranted in this case.

In support of its position that defendants willfully infringed the '386 patent, GNB first points to the fact that defendants did not offer an opinion of counsel directed towards the claims of the '386 patent. According to GNB, the opinions offered by Exide and General fail to demonstrate that they had a good faith belief that a court would hold the claims of the '386 patent invalid. To the extent defendants seek to argue they had formed such a good faith belief, GNB contends defendants' pursuit of patent protection for similar technology demonstrates the fallacy in this position.

Both parties offered evidence in the liability phase of this dispute relevant to the issue of willful infringement. *See GNB Battery Technologies, Inc. v. Exide Corp.*, 876 F.Supp. 582, 589–96 (D.Del.1995). For example, the parties presented evidence on General's development of its dual-terminal battery and the prosecution of the Anderson patent. To the extent the jury made findings of fact on those issues the court adopts those for purposes of assessing the issue of willful infringement. For example, the jury found specifically that General had developed its infringing dual-terminal battery with knowledge of the Kump and Jergl invention. D.I. 233.

In this phase, the parties offered additional evidence relevant to GNB's claim for enhanced damages for Exide's alleged willful infringement. Defendants called Rex E. Luzader to testify on the issue of willful infringement. Luzader held the position of Vice President of Engineering at General Battery until March 1987 when Exide acquired General. At that time Exide asked Luzader to leave the company. Exide rehired Luzader in October 1987 and he has held the position of Vice President of Engineering with Exide since that time.

Luzader was also the Chairman of General's patent committee from 1981 until 1987. This committee reviewed developments within General to determine if patent protection should be sought from the PTO. They also had the responsibility of reviewing instances of potential infringement and discussing those with outside counsel. The committee met monthly and had continuous dialogue with outside patent counsel. Luzader had the responsibility as Chairman of the committee to keep management informed on patent related issues. In the context of the patents in this suit, Luzader had discussions with Exide's president Hawkins about possible options.

Luzader testified that it was his opinion in 1985, when General considered its two-armed bushing, it would not infringe a valid patent. Luzader indicated that outside counsel had been consulted since the design of the original concept in 1985. They had formed the opinion that

[a]nyone learned in the art could combine and make universal terminal. We had the experience of the Incredicell already being in the marketplace. The Torque Starter already being in the marketplace, the Oxenreider patents, ... which established the art. There were other patents that were known and cited, the Japanese reference and the Strough patent, specifically. We felt internally that it didn't appear that that was a patentable issue. We sought outside counsel. Outside counsel gave us the same opinion. So we moved accordingly.

In 1987, after the '725 patent issued, Luzader had discussions with outside patent counsel regarding possible alternatives to the Exide design to avoid infringement. No alternatives however, were developed because he and others at Exide had formed a belief that the '725 patent should not have been issued and because of the retooling costs associated with switching designs.

Luzader testified that Exide's opinion on the validity of the '725 patent was based on prior art studies that they had done in the past. In particular, he was aware of the McGuire patent, the Halsall patent, and two patents issued to Terry Oxenreider and felt those references were the most pertinent prior art available. While he was not aware of any opinion of counsel related to the '386 patent, he believed no opinion regarding the two-armed bushing of the '386 patent was necessary because neither design was patentable.

Defendants also called Terry Russell Oxenreider to testify on the issue of willful infringement. Oxenreider was hired by General in 1970 and worked in the product engineering group. Oxenreider explained that he had worked with General's outside patent firm, Benasutti and Murray, since the early 1970s on many patent issues. While he did not consider himself skilled to the level of a patent lawyer, he felt he could read and understand claims in a patent. By the early 1980s Oxenreider believed the terminals on a battery could be moved to any position to fit any application.

In addition to the testimony of Luzader and Oxenreider, defendants offered into evidence eleven letters between General and Benasutti and Murray, as well as notes from a meeting between Luzader and Anthony S. Volpe, an attorney with the Benasutti firm. In a March 6, 1985, letter from Volpe to Terry Oxenreider of General, Volpe offered an opinion with respect to U.S. Patent 4,444,-853, the Halsall patent and a proposed design by General. In that letter, Volpe stated: "From the references of record, in particular your U.S. Patent 4,371,591, it is clear that there is no invention in providing a terminal which will vary the position of the ultimate external connection."

Volpe and Luzader apparently met on August 27, 1985, to discuss patent related matters regarding a possible battery design. A note, reflecting this meeting, indicates Luzader asked Volpe for an opinion regarding infringement of, in particular, the patents covering the Incredicell brand batteries by a design which appears to be the infringing design. Luzader sought Volpe's opinion on the use of an angled side terminal with a centered top terminal and on whether General could avoid infringement. Luzader also apparently sought Volpe's opinion on whether General could duplicate GNB's terminal arrangement and not infringe any patents and whether General could extend U.S. Patent 4,371,591 to "add a side terminal connection located at an angle in the cover like the GNB design." Luzader was also concerned whether this proposed design would infringe U.S. Patent 4,444,853 (the Halsall patent) or 4,424,264 (the McGuire patent). Finally, Luzader instructed Volpe to closely monitor patent activity by GNB.

Apparently, following up on the August 27, 1985, meeting Volpe sent a letter to Luzader dated October 10, 1985, in which he analyzed the file history of the McGuire patent and discussed possible infringement of that patent by General's proposed design. Volpe explained that the McGuire patent was allowed by the examiner at the PTO on the first official action with only one reference cited. He indicated that the proposed design would not infringe this patent because of the differences in the terminal structure and the absence of an equivalent side wall.

Volpe sent a second letter on this same day to Luzader, in which he discussed the results of a prior art search he conducted with respect to General's proposed design. In that letter, Volpe discussed the proposed design as a modification of existing General patents and stated that to the extent the McGuire patent would be asserted against such a design General should request reexamination of that patent. Volpe offered his opinion that General could proceed with its proposed design without infringing any issued patents. He also stated: "I believe that you may want to consider the patentability of [General's] proposed construction."

General personnel continued to correspond with Volpe regarding existing patents and potential infringement. A letter dated December 27, 1985, from Volpe to Carl Anderson of General, refers to phone conversations between the two individuals concerning GNB patents. The letter indicates Volpe was continuing to monitor whether any patents had been issued to GNB.

A letter dated April 27, 1987, from Volpe to Eugene J. Rutkowski of General indicates Volpe discovered the '725 patent which was issued to GNB. Volpe also attached a copy of the McGuire patent. He indicated the McGuire patent might be asserted against the GNB dual-terminal battery. He also indicated the terminal in the McGuire patent could be combined with an existing Oxenreider terminal. Finally, Volpe noted the McGuire patent was not cited by the examiner in the prosecution of the '725 patent.

On July 9, 1987, Volpe again wrote to Luzader. In that letter he discussed the progress of the prosecution of the Anderson patent. Volpe noted the claims of the '725 patent are limited to "the design shown in figure 3 of GNB '725 patent wherein the top terminal is oriented concentric with the interconnection between the bushing and the battery plates and in which the connecting arm extends sideways to the side terminal." However, Volpe indicated to Luzader that figure 7 of the '725 patent shows an embodiment where the top terminal is offset to the centerline. He goes on to suggest avoiding infringement of the '725 patent by designing around the "substantially completely embed-

ded" limitation appearing in the claims. Volpe also reports that given the filing date of the '725 patent it would be unlikely General could successfully prove it was the first to invent.

Volpe investigated the prosecution history of the '725 patent and reported on the results of that analysis to John J. Kelley, Director of Research and Development of the General–Exide Battery Corporation, in an August 10, 1987, letter. Volpe noted that during the course of prosecution of the '725 patent, the examiner found that the patent application filed by GNB actually contained two inventions and required GNB to elect to prosecute one. He noted that GNB chose to seek a patent on the one-armed bushing, which became the '725 patent. He also noted that figure 7 depicted the two-armed bushing, which GNB did not pursue in the initial prosecution. However, Volpe warned General that "there was still the possibility that the embodiement [sic] of figure 7 was still being prosecuted." In a section entitled "GNB Options," Volpe indicated it would be difficult for General to succeed in an interference between its patent and the '725 patent. He again noted that by providing an adaptor, or bushing, which was "not 'completely imbedded in the cover,'" General would "very likely avoid infringement of the '725 patent."

Volpe again wrote to John J. Kelley. In a letter dated August 10, 1987, Volpe reported to Kelley that he had uncovered U.S. Patent 2,052,499 which was issued to J.V. Strough in 1936. Volpe felt the Strough patent called into question the validity of the '725 patent because the patent describes and depicts a bushing in a battery which he considers "substantially completely embedded" in the cover. In the light of the discovery of the Strough reference, Volpe recommended the filing of a request for reexamination of the '725 patent with the PTO. According to Volpe, the "addition of the Strough reference teaches all of the missing features argued as a basis for patentability by the applicant of the GNB '725 patent." In a letter dated September 15, 1987, apparently following a telephone call, Volpe sent a copy of the Strough patent to David Beidler of General Exide Battery Corporation.

Apparently, General obtained a GNB battery and sent the cover of that battery to Benasutti and Murray for an evaluation of potential infringement of patents owned by General. In a letter dated October 5, 1987, from Frank Benasutti to David Beidler, Benasutti indicated his firm would undertake an infringement analysis of patents which were issued to Oxenreider. This letter was followed by a more detailed letter dated October 20, 1987, from Steven Boyd, of the Benasutti firm, to Kelley addressing the infringement issue.

Defendants also called Paul F. Prestia, Esquire, a patent attorney, to testify on the willfulness issue. He stated that defendants had a high level of confidence in the Benasutti and Murray firm and that they had an ongoing relationship which included written and oral communications. He explained that any opinion given on the '725 patent would apply to the '386 patent because the '386 patent had no prosecution history. He further offered his opinion that defendants' overall course of conduct demonstrated a high regard for the patent rights of others, including those of GNB.

*DISCUSSION*

Having set forth the evidence offered by the parties during the course of the damage phase of this case, the court turns to the parties' contentions regarding the damage issues. GNB contends that but for Exide's infringement it would have made the sales of both single- and dual-terminal batteries to KMart, Firestone, and Montgomery Ward. It also contends that as to the remaining infringing sales, it is entitled to a reasonable royalty of $5 per battery. Finally, plaintiff contends it has shown by clear and convincing evidence that defendants' infringement was willful and that it is entitled to increased damages.

Defendant responds by arguing plaintiff has failed to prove entitlement to lost profits and that, at most, plaintiff is entitled to a reasonable royalty of $200,000.00, which reflects Exide's cost to switch to a non-infringing alternative. Defendants also argue that plaintiff has failed to prove willful infringement.

Finally, the parties dispute the propriety of an award of prejudgment interest in this case. The court will address each of these issues in turn.

## I. *Can GNB Prove Entitlement to Lost Profits?*

■ Section 284 of Title 35 of the United States Code provides for the award of damages as compensation for patent infringement. It reads:

> Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court.

35 U.S.C. § 284. To recover lost profits, as opposed to a reasonable royalty, the patent owner must prove a "causal relationship between the infringement and its loss of profit." *BIC Leisure Prods. v. Windsurfing International, Inc.*, 1 F.3d 1214, 1218 (Fed.Cir.1993). To prove this causal relationship, the patent owner must show a reasonable probability that but for the infringement, "it would have made the infringer's sales." *Id.; King Instr. Corp. v. Otari Corp.*, 767 F.2d 853, 863 (Fed. Cir.1985), *cert. denied*, 475 U.S. 1016, 106 S.Ct. 1197, 89 L.Ed.2d 312 (1986).

■ One way a patentee can show "but for" causation is to show (1) a demand for the patented product, (2) an absence of acceptable non-infringing alternatives, (3) the marketing and manufacturing capability to exploit the demand, and (4) the amount of profit it would have made but for the infringement. *See Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 671–72 (Fed.Cir.), *cert. denied*, 488 U.S. 968, 109 S.Ct. 498, 102 L.Ed.2d 534 (1988); *Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1540–41 (Fed.Cir.1995) (Rader, J. concurring).

### A. Lost Profits for Sales to KMart

■ GNB first contends it is entitled to lost profits for Exide's sales of batteries to KMart. Exide responds by arguing that even had it not been able to offer its dual-terminal battery it would still have made the sales.

438

The court finds GNB has failed to prove that absent infringement by Exide, GNB would have made Exide's sales. The court credits the testimony of Exide's Calio and Osborne.

Prior to 1987, KMart did not sell dual-terminal batteries as part of its product line. In 1988, KMart sought bidders on its entire battery line. As part of this bid process, KMart expressed an interest in dual-terminal batteries. It also indicated that it wanted to sole source. It appears, however, that these were merely preferences to begin the bidding process and not firm requirements.

At least Delco, GNB, and Exide bid on KMart's battery business. As part of its bid, Exide offered a battery program called the Exide Express Delivery Program which offered a dramatic departure from the way KMart had been marketing batteries. As part of the program, Exide assumed responsibility for inventory control, logistics, delivery, and advertising. Under Exide's proposal, it would reduce KMart's role in managing its battery business, thus reducing KMart's expenses. At the same time, Exide's proposal offered the opportunity for increased revenue to KMart through increased sales.

At the time it bid on the KMart business, Delco did not offer a dual-terminal battery. However, in the final selection process KMart had eliminated all but Exide and Delco. It eventually awarded the marine battery business to Delco and the automotive battery business to Exide.

It appears KMart awarded its battery business to Exide because of its battery program, which provided a number of benefits to KMart. The fact that Delco, who did not offer a dual-terminal battery at the time, was in the final running suggests that KMart was not focused on the dual-terminal battery, but merely had expressed a desire to sell them as part of its battery line. It appears that had Exide not been able to offer its dual-terminal battery GNB would not have secured KMart's business. Therefore, the court finds that GNB has failed to prove it would have made the sales to KMart absent Exide's infringement. Consequently, GNB is not entitled to lost profits for sales to KMart.

B. Lost Profits for Sales to Firestone

■ As with KMart, GNB seeks lost profits for Exide's sales of infringing batteries to Firestone. Exide contends Firestone's decision to award the battery business to it was based on its marketing program and ability to increase Firestone's sales and not because it offered a dual-terminal battery. The court credits the testimony of Martin on this issue.

By 1988, GNB supplied 20% of the batteries to Firestone and Exide supplied 80%. In 1988, Firestone solicited bids from JCI, Exide, Delco, and GNB. In that bid process, Firestone indicated a preference for a battery line which included dual-terminal batteries. However, it also clearly indicated alternatives would be acceptable. In all cases, Firestone stated that battery power was the key feature in which it was interested. Firestone also stated a preference to award its battery business to one supplier.

Firestone awarded the battery business to Exide. It appears Firestone focused on Exide's ability to offer a direct delivery program similar to the one it offered to KMart. It also appears Firestone was influenced by the time involved in having to switch Exide from 80% of the business to 100% as compared with 20% to 100% for GNB. In view of these facts, the court finds GNB has failed to prove it would have made the sales to Firestone absent Exide's infringement. Consequently, the court finds GNB is not entitled to lost profits for sales to Firestone.

C. Lost Profits for Sales to Montgomery Ward

■ Finally, GNB seeks lost profits for Exide's sales of infringing batteries to Montgomery Ward. Exide argues that had it not been able to offer its dual-terminal battery, GNB would not have secured the business. The court credits the testimony of Schoeberl on this issue. His testimony indicates that Montgomery Ward awarded the battery business to Exide in 1990. Ward chose Exide over GNB and Delco, who was eliminated only in the last thirty days.

It appears Ward had become dissatisfied with the quality of GNB's batteries. Apparently, Ward was particularly dissatisfied by

GNB's decision to market the Champion brand dual-terminal battery through other distribution channels rather than exclusively through Ward. Finally, since 1989, GNB has not bid on Ward's battery business. The court finds GNB has failed to prove that but for the infringement it would have made Exide's sales to Ward. Consequently, the court finds GNB is not entitled to lost profits for Exide's sales of batteries to Montgomery Ward.

### D. Conclusion on Lost Profits

The court finds GNB has failed to prove that but for Exide's infringement of the '386 patent that it would have made Exide's sales to KMart, Firestone, or Montgomery Ward. Thus, the court finds GNB has failed to prove entitlement to lost profits for Exide's sales of infringing batteries to those retailers.

■ Because GNB has failed to prove entitlement to lost profits on infringing dual-terminal batteries to KMart, Firestone or Montgomery Ward, the court also finds that it has failed to prove entitlement to lost profits on sales of non-infringing, single- and dual-terminal batteries to those retailers. Consequently, the court turns to the issue of what royalty rate would reasonably compensate GNB for Exide's infringement.

### II. *What Royalty Rate is Reasonable to Compensate GNB?*

GNB contends it is entitled to a reasonable royalty of $5 per battery. Having found GNB is not entitled to lost profits, the court will consider all 4,488,017 infringing sales in the calculation of a reasonable royalty award. Exide contends that the patent is worthless and that the court should award no running royalty. Instead, Exide argues that the court should award a lump sum royalty of $200,000, which would be no more than its cost of switching to a non-infringing alternative.

■ Under 35 U.S.C. § 284, a patentee is entitled to no less than a reasonable royalty to compensate for infringement. In determining the royalty rate, the Federal Circuit has approved of the use of the factors set forth in *Georgia–Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116 (S.D.N.Y.1970); *modified,* 446 F.2d 295 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). *See SmithKline Diag., Inc. v. Helena Labs., Corp.,* 926 F.2d 1161, 1168 (Fed.Cir.1991). The *Georgia–Pacific* factors include the following: rates paid for comparable licenses, the patent holder's licensing policy, the commercial relationship between the patent holder and infringer, the effect of selling the patented product on sales of other products, the profitability of the patented product, and opinion testimony from qualified experts. 318 F.Supp. at 1120.

■ The court declines to adopt either party's assessment of a reasonable royalty. First, the court finds GNB has failed to meet it burden of proving entitlement to a $5 per battery reasonable royalty. Exide's expert testified that this rate was on the order of a 15% to 20% royalty rate and that such a rate is extreme for a commodity product such as a replacement battery. Furthermore, testimony suggested that the battery industry is highly competitive and operates on very small profit margins, which suggests a low royalty rate. Finally, the court finds neither party would have agreed to such a rate in the course of hypothetical licensing negotiations.

In addition, the court declines to adopt the lump sum payment of $200,000 advocated by Exide. As with GNB's proposed rate, the court finds neither party would have agreed to such a rate in the course of a hypothetical negotiation. Second, GNB chose to infringe the '386 patent and in fact, as the jury found in the liability phase, copied certain aspects of GNB's battery. This copying suggests that GNB's design is not worthless, as Exide's experts would have the court believe. Third, as testimony in the liability phase indicated, the patented invention had several advantages. For example, it provided a sturdy, leak-proof seal, and proved more reliable than prior dual-terminal batteries because of the embedded bushing structure. Finally, battery suppliers could normally expect sales of other batteries in addition to dual-terminal batteries.

Instead of adopting either party's calculation of a reasonable royalty, the court finds a

reasonable royalty in this case, considering all the facts and circumstances, to be $0.80 per battery, which is between 2% and 3% of the average selling price of the infringing batteries. In addition to the factors considered in rejecting the parties' proposed rates, the court considers the following evidence in arriving at a rate of $0.80 per battery.

Evidence offered by GNB showed that the selling price of the infringing batteries ranged from $29 to $40. Parr testified that a typical royalty rate between competitors for defining technology would be between 3% and 5%. However, Parr also explained that the low profitability of the battery industry and the nature of the invention suggest a lower rate. Parr also testified that while typical royalty rates for trademarks are between 7% and 10%, GNB paid only 2.5% for the Champion bow tie logo, which has significantly contributed to increased sales of the Champion battery. At the same time, the invention apparently provided a number of advantages as well. This evidence suggests that an appropriate royalty rate would be between 2% and 3% of the selling price of infringing batteries.

With that royalty rate, the court finds the total reasonable royalty award based on infringing sales of 4,488,017 batteries to be $3,590,413.60.

### III. Can GNB Prove Defendants Willfully Infringed the '386 Patent?

GNB contends defendants willfully infringed the '386 patent and that, as a result, the court should increase the damages. Defendants respond by arguing that the decision to continue to manufacture and sell their dual-terminal battery was based on a good faith belief that they were making and selling what was in the prior art and that the '386 and '725 patents were invalid based on advice from their technical staff and outside patent counsel.

■ The patent statute includes a provision allowing the court to enhance the damages imposed on a patent infringer up to three times. 35 U.S.C. § 284. This provision makes no mention of the circumstances in which a court may increase the damages.

However, the Federal Circuit has clarified that such awards are only appropriate where infringement is found to be willful. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 831 (Fed. Cir.1992) (stating that if infringement is "innocent, increased damages are not awardable for the infringement").

■ Infringement becomes willful "when, upon consideration of the totality of the circumstances, clear and convincing evidence establishes that the infringer acted in disregard of the patent, that the infringer had no reasonable basis for believing it had a right to engage in the infringing acts." *Electro Medical Sys., S.A. v. Cooper Life Sciences, Inc.,* 34 F.3d 1048, 1056 (Fed.Cir.1994). Whether an infringer acted willfully or wantonly is a question of fact that rests on a determination of the infringer's state of mind. *Read,* 970 F.2d at 828.

In considering the ever-present claim of willful infringement, this court has identified a number of facts that may be relevant in determining the infringer's state of mind. These facts include "evidence that the infringer copied the ideas or design, evidence that the infringer had actual notice of the patent, and evidence that the infringer sought, obtained, and justifiably relied on legal advice from counsel on whether or not the patents were invalid or infringed." *Thorn EMI N.Am. v. Micron Technology, Inc.,* 837 F.Supp. 616, 620 (D.Del.1993).

■ However, even where infringement is found to be willful, a court is not required to increase the damages. *Read,* 970 F.2d at 826. Rather, once there has been a finding of willful infringement, the court must then look at the egregiousness of the infringer's conduct based on all of the facts and circumstances to determine whether and how much to enhance the damages. *Id.* A court must consider "factors that render defendant's conduct more culpable, as well as factors that are mitigating or ameliorating." *Id.*

■ The Federal Circuit has identified a number of facts which may be relevant in assessing the egregiousness of the infringer's conduct. These facts include: (1) evidence that the infringer deliberately copied the ideas or designs of the patentee; (2) evidence

that the infringer, when he knew of the other's patent, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) evidence of the infringer's behavior as a part to the litigation; (4) evidence of the infringer's size and financial condition; (5) evidence as to the closeness of the case; (6) evidence regarding the duration of the infringer's conduct; (7) evidence showing remedial action by the defendant; (8) evidence regarding defendant's motivation for harm; and (9) evidence as to whether the defendant attempted to conceal its misconduct. *Id.* at 826–29.

■■■ GNB argues that defendants willfully infringed the '386 patent. It relies primarily on the absence of an opinion of counsel directed to the '386 patent. GNB also argues that that defendants' actions to seek a patent for Anderson's invention and their argument that key prior art could not be combined to render it obvious during prosecution show defendants could not have formed a good faith belief that the patent was invalid.

Defendants argue they believed no patent should have been issued on either the one- or two-armed bushing. They rely on ongoing consultation with outside counsel as well as with an experienced technical staff to demonstrate this good faith belief.

The court is troubled by defendants' assertion that they had formed a good faith belief that no patent should have been issued on either the one- or two-armed bushings claimed in the '725 and '386 patents respectively, while at the same time advocating at the PTO that a similar invention was patentable. Furthermore, the letters offered by defendants in support of their claim of good faith appear to show that General contemplated provoking an interference with GNB over the '725 patent, and not that defendants' personnel were affirmatively certain from the onset that it was merely an extension of the prior art. These letters also do not discuss any case law or burdens of proof that would apply in a trial over the claims of an issued United States patent.

However, the evidence offered by defendants also does not suggest that they proceeded in disregard of the patent rights of others. Instead, the evidence reflects ongoing consultation with the in-house patent review committee and outside patent counsel over proposed designs and existing and future patents.

To the extent defendants may have willfully infringed the '386 patent, the court declines to enhance the damages. The validity issues in this dispute were very close. The jury's inability to reach a verdict regarding the validity of the '725 patent, which is a closely related patent, provides some evidence of the closeness of this case. In addition, defendants appear to have regularly reviewed designs for possible infringement of patents both internally by their patent review committee and in ongoing consultations with outside counsel. Finally, while defendants manufactured and sold nearly 4.5 million infringing batteries they have switched during the pendency of this lawsuit to a noninfringing design. For these reasons, the court finds this case inappropriate for the enhancement of damages.

## IV. *Is GNB Entitled to Prejudgment Interest, and if so, at What Rate?*

GNB contends it is entitled to an award of prejudgment interest pursuant to 35 U.S.C. § 284. It seeks interest at a rate of 3% over the prevailing Treasury Bill rate, compounded daily, which it argues was the cost of money to GNB during the relevant period. Exide argues GNB is not entitled to prejudgment interest in this case. In addition, Exide contends GNB is not entitled to the rate of interest that it seeks.

■■■ As to whether GNB is entitled to prejudgment interest at all, Exide first argues GNB failed to notify customers of its patent position. It would appear Exide contends because GNB did not tell retailers such as KMart of its patent during the course of bidding for battery business that GNB is not entitled to prejudgment interest. In response, GNB notes that it brought this lawsuit shortly after the patents issued. It further notes that there is no legal requirement that it inform customers of its patents. The court finds GNB's failure to notify its customers of its patent rights does not form the

basis for a denial of prejudgment interest in this case.

■ Exide also argues the GNB unjustifiably delayed resolution of this case and should not therefore be awarded prejudgment interest. In particular, Exide points to sanctions imposed on GNB for failure to promptly respond to interrogatories posed by Exide during the course of this litigation. GNB had claimed it could not determine whether certain prior art showed bushings "substantially completely embedded." Exide argues GNB's delays and its improper responses prevented the court from promptly resolving a motion for summary judgment on the validity of the patents. The court finds an insufficient factual basis to attribute any delay or decision on Exide's earlier motion for a summary judgment to GNB's responses to interrogatory requests. Consequently, the court will not deny prejudgment interest on this ground.

■ Third, Exide contends GNB should not be entitled to prejudgment interest because it unlawfully attempted to extend the scope of its claims. Exide presented an alternative construction of a battery to GNB and GNB advocated that such a construction would still infringe the claims of the '386 patent. The court will not deny prejudgment interest on this ground. Consequently, the court finds GNB is entitled to prejudgment interest.

■ Next, Exide contends GNB is not entitled to the rate of interest that it seeks. In particular, Exide argues GNB should be limited to the "statutory" rate of interest because GNB denied Exide discovery on the cost of money to GNB during the relevant period.

GNB seeks prejudgment interest at a rate equal to the prevailing Treasury Bill rate plus 3%, arguing this rate reflects the cost of money to GNB. At trial, GNB offered into evidence a summary of the average three-month Treasury Bill rates prepared by its expert witness Sims. In addition, GNB called Thomas A. O'Hare to testify on the cost of money to GNB during the relevant period. O'Hare is the division comptroller for the automotive battery group at GNB.

He testified that between 1987 and 1993, Pacific Dunlop Ltd., GNB's parent company, could originate debt at 3% to 3.5% above the prevailing Treasury Bill rate. He based his testimony on a statement in GNB's annual report indicating that debt is at the rate of 6.75% or 7% per year. In addition, O'Hare testified that interest was compounded daily. Defendants offered no testimony on this issue and did not cross-examine O'Hare on this testimony.

Instead, Exide argues it was improperly denied discovery on this issue and as a result, the court should not consider this testimony. GNB responds by arguing that it did not deny any discovery to Exide on this issue. GNB notes O'Hare was listed as a fact witness and identified as such to Exide months before trial. In addition, Exide deposed Sims on his summary of Treasury Bill rates and learned that he was simply offering this summary and supporting documents to show the prevailing rates. The court finds GNB did not improperly deny discovery to Exide on this issue.

Given that Exide offered no testimony on this issue, the court will adopt the rate proposed by GNB. Thus, the court will award prejudgment interest at an annual percentage rate equal to the average rate of three-month Treasury Bills for each fiscal year plus 3%, compounded daily, to reflect the cost of money to GNB. Finally, the court will consider the funds to have been borrowed on March 31, the last day of each fiscal year, of each year in question.

CONCLUSION

For these reasons, the court finds GNB has failed to prove it is entitled to lost profits. In addition, the court finds that defendants' conduct does not warrant increased damages.

However, the court finds GNB is entitled to a reasonable royalty of $0.80 per infringing battery sold by defendants. At this royalty rate, GNB is entitled to damages in the amount of $3,590,413.60 based on 4,488,017 infringing sales. In addition, the court finds GNB is entitled to prejudgment interest at a rate equal to the average rate of three-month Treasury Bills for each fiscal year plus 3%,

compounded daily, to reflect the cost of money to GNB. The court will order GNB to file a paper showing how it calculates the total damage award in accordance with the court's finding on prejudgment interest. The court will enter an Order in accordance with this Opinion.